Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/15/2021 09:08 AM CST

IN RE INTEREST OF LEYTON C. AND LANDYN C.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
MADISON C., APPELLANT.

___ N.W.2d ___

Filed October 23, 2020.    No. S-19-423.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

2. **Parental Rights: Proof.** In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in Neb. Rev. Stat. § 43-292 (Reissue 2016) exists and that termination is in the children's best interests.

3. **Juvenile Courts: Minors.** The foremost purpose and objective of the Nebraska Juvenile Code is to promote and protect the juvenile's best interests, and the juvenile code must be construed to assure the rights of all juveniles to care and protection.

4. **Parental Rights: Presumptions: Proof.** A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit.

5. **Parental Rights: Parent and Child.** In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.

6. **Parental Rights.** Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights.

7. ____. When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights.

8. **Parental Rights: Time.** The 15-month condition contained in Neb. Rev. Stat. § 43-292(7) (Reissue 2016) provides a reasonable timetable for parents to rehabilitate themselves.

9. **Courts: Appeal and Error.** Upon reversing a decision of the Nebraska Court of Appeals, the Nebraska Supreme Court may consider, as it deems appropriate, some or all of the assignments of error the Court of Appeals did not reach.

10. **Parental Rights.** One need not have physical possession of a child to demonstrate the existence of neglect contemplated by Neb. Rev. Stat. § 43-292(2) (Reissue 2016).

11. **Parent and Child: Child Custody.** A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect.

12. **Parental Rights: Proof.** Any one of the bases for termination of parental rights codified by Neb. Rev. Stat. § 43-292 (Reissue 2016) can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child.

Petition for further review from the Court of Appeals, Pirtle, Riedmann, and Welch, Judges, on appeal thereto from the Separate Juvenile Court of Lancaster County, Linda S. Porter, Judge. Judgment of Court of Appeals reversed, and cause remanded with direction.

Melanie A. Kirk, of Johnson, Flodman, Guenzel & Widger, for appellant.

Patrick F. Condon, Lancaster County Attorney, Maureen Lamski, and Thomas Gage, Senior Certified Law Student, for appellee.

Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., guardian ad litem.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## INTRODUCTION

The juvenile court terminated a mother's parental rights to her children. The Nebraska Court of Appeals reversed, concluding that the State failed to prove that termination was in the children's best interests.[1] We granted the petitions for further review of the children's guardian ad litem (GAL) and the State. Because clear and convincing evidence supported termination of parental rights, we reverse the Court of Appeals' decision and remand the cause with direction.

## BACKGROUND

Madison C. is the mother of Leyton C., born in August 2015, and Landyn C., born in February 2017. The children's father has relinquished his parental rights and is not involved in this appeal.

### Procedural Background

In July 2016, the State filed a petition seeking to adjudicate Leyton.[2] The petition alleged that Madison left Leyton in the care of Madison's mother in November 2015 without making proper provisions for his care, that Madison tested positive for methamphetamine in June 2016, that Madison failed to consistently provide a safe and stable home for Leyton, and that Leyton was at risk of harm.

In September 2016, the juvenile court adjudicated Leyton following Madison's plea of no contest to the allegations in the petition. The court ordered Madison not to remove Leyton from his maternal grandparents' home, where Madison and Leyton were residing. It further ordered Madison to refrain from using or possessing controlled substances and to submit to random drug testing.

---

[1] *In re Interest of Leyton C. & Landyn C.*, 28 Neb. App. 95, 940 N.W.2d 288 (2020).

[2] See Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015).

In a December 1, 2016, dispositional order, the court removed Leyton from Madison's care. The court placed Leyton's physical custody with Madison's mother and allowed Madison to reside with them. The court noted that Madison failed to enter outpatient substance abuse treatment.

In January 2017, the court prohibited any contact between Leyton and Madison's boyfriend, Jaden R. In February, the State moved for an emergency placement change because Madison's mother, while accompanied by Leyton, gave Jaden a ride. The court subsequently placed Leyton with Madison's sister.

In March 2017, the State filed a supplemental petition, seeking to adjudicate Landyn, Madison's newborn baby, as a juvenile under § 43-247(3)(a) (Reissue 2016). The petition alleged that Landyn was in a situation dangerous to life or limb or injurious to his health or morals because his meconium tested positive for amphetamines, Madison tested positive for methamphetamine, and Madison failed to comply with orders to correct the adjudicated issues regarding Leyton.

In April 2017, the court adjudicated Landyn after Madison pled no contest to the allegations of the supplemental petition. The court placed Landyn in a nonrelative foster home. Leyton joined Landyn at that foster home in July.

In November 2017, after Madison began cooperating with services, the court ordered that she have monitored parenting time with the children. The State later moved for an order approving a change in placement. On January 3, 2018, the court approved placing the children with Madison.

On July 3, 2018, the court entered an order directing placement of the children outside Madison's home. It referenced Madison's "failure to participate in virtually all court ordered services over the last three months, including individual counseling/treatment, random drug testing, and family support."

On October 11, 2018, the State filed a motion for termination of Madison's parental rights. It alleged that termination of such rights was in the children's best interests, and it set forth several statutory grounds for termination under Neb. Rev.

Stat. § 43-292(2), (4), and (6) (Reissue 2016). As to Leyton only, it alleged the ground enumerated in § 43-292(7).

## Termination Hearing

The juvenile court conducted a hearing over several dates beginning on December 14, 2018, and concluding on February 26, 2019.

The evidence established that at the time of Leyton's birth, Madison was 18½ years old and living with her parents. Approximately 1 month later, in September 2015, Madison met Jaden. Their relationship moved quickly. In November, Madison accompanied Jaden to South Dakota for 3 days. Upon her return, she was cited for child abandonment and unlawful use of a motor vehicle. At trial, Madison did not recall admitting to a police officer that she had left Leyton for approximately 18 days.

Jaden became controlling. Madison testified that he would not let her return home to see Leyton or call her family. When she was allowed to see her family, it was usually for "30 minutes at max" and in Jaden's presence. Madison testified that starting in 2016, she would be "lucky [to] see [Leyton] at all during the week." Because remarks by Jaden caused Madison to be concerned for Leyton's safety, she left Leyton with her family.

In January 2016, Jaden began physically abusing Madison. He punched and kicked her and used other implements to hurt her. He threatened her life at knifepoint. One witness characterized Jaden's abuse of Madison as "horrific" and "severe." Madison testified that Jaden hurt her several times a week until May 2017, when he became incarcerated.

According to Madison, Jaden made her use methamphetamine starting in 2016. But she admitted that not all of the methamphetamine she used with Jaden was against her will. After she tested positive for methamphetamine in June, she claimed that she had been forced to use the drug. When both Madison and Landyn tested positive for methamphetamine in approximately March 2017, Madison maintained that a

friend had put something in her drink. Madison's case manager from July 2016 to May 2017 testified that Madison never admitted to "knowingly" using methamphetamine.

In June 2016, Madison completed a substance abuse evaluation which recommended "Level One Outpatient Therapy." Madison did not engage in the recommended outpatient treatment or in individual therapy. According to Madison's case manager, Madison "wanted to get through the pregnancy and ensure that Landyn would be born safely before engaging in services." Her cooperation with drug testing was inconsistent. Madison's case manager testified that she missed many tests between November 2016 and April 2017.

Emily Goodman, a licensed independent mental health practitioner, initially met with Madison in March 2017 to engage in outpatient drug and alcohol treatment. Goodman set up recurring appointments to meet with Madison twice per week, but Madison did not attend between March 10 and June 20. As of July 14, when weekly therapy was recommended, Madison maintained regular attendance, not missing an appointment until September 29. Goodman believed Madison had one of the most severe cases of post-traumatic stress disorder (PTSD) that Goodman had seen. Goodman last met with Madison in March 2018.

Madison agreed that she did not engage in any services until the fall of 2017. She explained that "Jaden was still around so, I mean, it was kind of difficult and I didn't know what was going on." After Madison's parenting time was reduced to once per week in August 2017, Madison's participation improved and she began attending visits. Her parenting time was then increased to twice per week. In November, the Department of Health and Human Services recommended monitored parenting time because of Madison's compliance with services.

After placement of the children with Madison in January 2018, Madison's participation in services waned. She met with Goodman once in January, even though it was recommended that they meet weekly. She ceased regularly submitting to

drug testing and attending team meetings. When Goodman brought up Madison's noncompliance with drug testing, Madison replied that she was tired of others being involved in her life and "just wanted to be done with all of it." Madison relapsed using methamphetamine in approximately March, explaining that she feared losing her children and wanted to "numb [her] feelings."

In approximately April 2018, Madison began a relationship with Riley S. She was not honest with her caseworker or her treatment team about the relationship. At trial, she admitted using drugs with him. Because Riley "had a warrant out for assault, . . . he was not allowed to be around the [children]." Madison admitted that Riley was in her apartment during a visit.

Gay Malone, a child and family service specialist with the Department of Health and Human Services, began working on Madison's case in May 2017. At that time, services implemented for Madison included random drug screening, supervised visitation, and individual therapy. Madison did not consistently participate in those services. Malone testified that Madison either was unavailable for visits or was emotionally upset at such visits about trying to pay rent and having the case ongoing. In May 2018, "drop-ins" were implemented in an effort to ensure the children's safety, but Madison did not cooperate with the drop-ins.

On July 2, 2018, the children were removed from Madison's care. Hair follicle testing on the children completed on July 6 revealed that Leyton tested positive for exposure to methamphetamine and marijuana and Landyn tested positive for exposure to marijuana. Madison denied using methamphetamine, but stated that her friends had used the drug in her apartment. At the termination trial, however, Madison admitted that Leyton tested positive for methamphetamine because she used the drug in her residence.

In July 2018, Sarah Worley began providing individual therapy to Madison, focusing on PTSD and substance use.

Madison initially missed four sessions in July and August and did not attend on a consistent basis. Madison began drug testing on July 24, but she participated infrequently in August.

Worley completed an updated substance abuse evaluation, which recommended residential treatment. Upon Madison's arrival for residential treatment in August, she tested positive for methamphetamine, amphetamines, marijuana, and opiates. Madison ultimately left residential treatment after a few days, because someone she knew at the time of her abuse was at the program. Worley believed that having such a person present would have made treatment more difficult. At trial, Madison also testified that she left that treatment because it "wasn't [her] niche," explaining that residential treatment "was too much." Worley helped Madison find an alternative way to address her substance abuse needs. Approximately a week after Madison left residential treatment, she began intensive outpatient treatment. The record is unclear whether she began that treatment in August or September.

The court received recordings of September 2018 telephone calls between Madison and Riley while he was in jail and of a jail visit with Riley. At the time of the telephone calls, Madison had told Worley that she was no longer dating Riley. In the recordings, Madison and Riley expressed their love for one another and their desire to move out of state and be together forever.

The conversations between Madison and Riley concerned Malone. One telephone call occurred during a visit, and Malone believed she could hear Leyton's voice. Malone was disturbed that Madison's mother—who had supported Madison's relationship with Jaden—was aware that Madison accepted a jail telephone call from Riley. Malone noted that Madison and Riley talked as though he had stayed in Madison's apartment since the spring of 2018. Malone was troubled that Madison would not sign a release to allow her most recent evaluator to talk to Madison's parents—with whom Madison was reportedly living at the time. Malone questioned whether Madison

was truly living with her parents because Madison said during one of the calls that she needed to get her belongings from Riley's grandmother's house. Malone testified that when she viewed the jail video between Riley and Madison, she "d[id] not see a stress — [PTSD] reaction" when Madison was telling Riley about Jaden's claims of being violent in prison.

In September 2018, Madison tested positive for methamphetamine. In October, Madison twice tested positive for clonazepam, a medication for which she did not have a prescription. Worley was troubled that Madison did not take responsibility for the clonazepam result. At trial, Madison attributed testing positive for clonazepam to taking one of Riley's medications. She explained that although she "broke up with him after he got outta jail," she "hung out with him" in October. Worley testified that Madison told her in September that she had broken up with Riley "because of his drug use and [because] he wasn't a good influence in her life." Madison tested positive for morphine in December. Worley believed that the low level of drug detected was consistent with Madison's report of having eaten poppyseeds.

Worley testified that Madison had made excellent progress in the 3 months prior to trial. Worley explained that Madison had been "continuously attending treatment," had been participating fully, and had been honest about what had happened to her. Worley noted that Madison had completed intensive outpatient treatment and that Madison continued to engage with relapse prevention services. Worley felt that Madison's prognosis was "good." Although Madison had made progress during individual therapy, Worley testified that Madison still had work to do with regard to her PTSD.

A registered nurse who has worked extensively in the area of domestic violence offered general testimony. She testified that victims of domestic violence sometimes deny or minimize what is occurring or want to disbelieve that someone could do such things to them. Recovery takes time, and substance abuse is often seen along with domestic violence because drug

usage is a coping mechanism. According to the registered nurse, if there are coexisting issues of domestic violence and substance abuse, it is expected that the recovery time would be longer. Recovery from domestic violence can be manifested in different ways, including the ability to function on a daily basis, obtaining employment, managing emotional or psychological symptoms from the violence, or managing substance abuse. The registered nurse was not familiar with Madison aside from "very limited information" and had no knowledge whether any of her testimony applied to Madison.

Obtaining employment had long been a goal set for Madison. A November 2017 order directed her to work with family support services regarding gaining employment. But Madison did not take advantage of the services offered. Malone was unaware of Madison's having any job prior to the filing of the motion to terminate parental rights in October 2018. That month, Madison obtained a job, working 2 days a week. She was unemployed at the time of the February 2019 hearing.

The evidence regarding Madison's parenting of the children was positive. Goodman testified that Madison was able to adequately and appropriately parent her children, and she did not observe anything leading her to believe that Madison was a safety concern or a risk to the children. A family support worker similarly testified that she never had to intervene due to safety concerns. About the only concern expressed by any witness was that Madison "wasn't fully parenting the children" because her family often attended visits and interacted with the children.

Madison believed that she had changed and that she would no longer endanger her children. Madison testified that she knows how to ask for help and that she does not use drugs. She recognized that Riley was not a good influence and should not be around her children.

Malone believed termination of Madison's parental rights was in the children's best interests. She explained that the children deserve the stability that comes from permanency and

that both children had been out of Madison's care for 16 months of the most recent 22 months. Malone testified that Madison had been unable to demonstrate the sustained change that was necessary for her to provide a stable and permanent home for the children. Malone recognized that Madison demonstrated a change from August 2017 through February 2018, but that Madison then stopped participating in services, resulting in the children's removal from her care. Malone did not believe that survivors of domestic violence should be given extra time to reunify with their children. She explained that "children don't understand that the reason that they're not reunified . . . is because their mother was a survivor of domestic violence, or used substances to delay her recovery."

Other witnesses provided insight on the children's interests. Goodman testified that "the more removals from a primary caregiver[,] the increase of traumatic response for children." Worley testified that being in foster care for an extended period can damage a child's "sense of self and . . . belonging." Leyton's therapist testified that it was "especially harmful for younger children to move back and forth between home environments because . . . the time of attachment and significant development for most children occurs between those ages of zero and five." Disruption may cause a young child to believe that he or she is unsafe or that the world is unsafe. She testified that Leyton needed permanency "as immediately as possible," noting that he had been removed twice and that he was very young.

## Juvenile Court's Decision

In April 2019, the court entered an order terminating Madison's parental rights. The court observed that Madison "has struggled with honesty when it comes to her own use of controlled substances and her relationships with violent partners" throughout this case. It stated that the testimony of Madison and Riley that they had ended their relationship "did not appear credible and appeared to be situationally motivated by the pending termination of parental rights rather than

any honest recognition by [Madison] that he was an unhealthy influence for her or for her children."

The court found that the State proved by clear and convincing evidence that termination of Madison's parental rights was warranted. It found the State proved grounds for termination under § 43-292(2), (4), and (6) as to both children and under § 43-292(7) as to Leyton. The court also found that termination of parental rights was in the children's best interests.

## Court of Appeals' Decision

Upon Madison's appeal, a majority of the Court of Appeals determined that the juvenile court erred in concluding that termination of Madison's parental rights was in the children's best interests. Because the majority's resolution on that issue was dispositive, it did not consider whether the State proved a statutory ground for termination.

The majority found that Madison demonstrated a continued improvement in her parenting skills and had established a beneficial relationship with her children. The majority recognized that it would have been in the children's best interests for Madison to end her relationship with Jaden and engage in services, but stated that "her inability or unwillingness to do so must be viewed in consideration of her young age and the abusive relationship in which she was transfixed."[3] After evaluating Madison's progress "in the context of the situation in which the parent exists," the majority found that termination of Madison's parental rights "came too quickly."[4] The majority reasoned that "[g]iven Madison's young age and trauma experience, we cannot find that the timeline of this case provides her with a 'reasonable time' in which to rehabilitate herself."[5]

---

[3] *In re Interest of Leyton C. & Landyn C., supra* note 1, 28 Neb. App. at 107, 940 N.W.2d at 296.

[4] *Id.* at 109, 940 N.W.2d at 297.

[5] *Id.* at 110, 940 N.W.2d at 298.

The dissenting judge noted that the juvenile court specifically recognized Madison had struggled with honesty throughout the case. The judge found "particularly concerning . . . Madison's inability to separate herself from the type of unhealthy relationships that precipitated many of her problems."[6]

We granted the petitions for further review of the GAL and the State.

## ASSIGNMENTS OF ERROR

The GAL assigns that the Court of Appeals erred in (1) finding that Madison had made "'continued progress'" in correcting the conditions that led to the adjudication, (2) finding that the State failed to prove by clear and convincing evidence that Madison was unable or unwilling to rehabilitate herself within a reasonable time, and (3) finding that the State failed to prove by clear and convincing evidence that the children's best interests were served by terminating Madison's parental rights.

The State assigns that the Court of Appeals erred in (1) failing to follow the long line of cases establishing that juveniles should not have to wait for uncertain parental maturity[7] and (2) failing to give deference to the trial judge's assessment of credibility and relying heavily on the testimony of Madison.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.[8]

---

[6] *Id.* at 115, 940 N.W.2d at 301 (Pirtle, Judge, dissenting).

[7] *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016); *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015); *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015).

[8] *In re Interest of Vladimir G.*, 306 Neb. 127, 944 N.W.2d 309 (2020).

## ANALYSIS

[2] In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the children's best interests.[9] The Court of Appeals began with the best interests component, finding it to be dispositive. We likewise begin our analysis by considering the children's best interests.

## Best Interests

[3] The GAL and the State collectively assign five errors which essentially challenge the Court of Appeals' determination that the juvenile court erred in finding that the State proved by clear and convincing evidence that terminating Madison's parental rights was in the children's best interests. We are mindful that the foremost purpose and objective of the Nebraska Juvenile Code is to promote and protect the juvenile's best interests, and the juvenile code must be construed to assure the rights of all juveniles to care and protection.[10]

[4] A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit.[11] In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.[12] The best interests analysis and the parental fitness analysis are separate

---

[9] *In re Interest of Donald B. & Devin B.*, 304 Neb. 239, 933 N.W.2d 864 (2019).

[10] *In re Interest of Veronica H.*, 272 Neb. 370, 721 N.W.2d 651 (2006).

[11] *In re Interest of Alec S., supra* note 7.

[12] *Id.*

inquiries, but each examines essentially the same underlying facts as the other.[13]

The children's best interests and Madison's fitness to parent them were affected by her drug use and her choice of intimate partners. There is no dispute that Madison began using methamphetamine in 2016, that Landyn's meconium tested positive for amphetamines, and that hair follicle testing of the children in July 2018 showed that Leyton had been exposed to methamphetamine and marijuana and that Landyn had been exposed to marijuana. Goodman testified that parents who are actively under the influence of methamphetamine typically show difficulty providing a safe environment for their children. At the termination trial, evidence was adduced regarding three of Madison's relationships with men. All three men had used drugs and had spent time in jail. Such relationships put the children's safety at risk.

[5] We have stated that in proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.[14] The GAL assigns that the Court of Appeals erred in finding that "Madison has made continued progress"[15] and that "the State has failed to prove by clear and convincing evidence that Madison is unable or unwilling to rehabilitate herself within a reasonable time."[16] We agree.

[6] Madison had been formally under the juvenile court's jurisdiction since Leyton's adjudication in September 2016. It was not until approximately a year later that she began complying with services implemented to correct the conditions leading to the adjudication. Her compliance lasted for

---

[13] *Id.*

[14] *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

[15] *In re Interest of Leyton C. & Landyn C., supra* note 1, 28 Neb. App. at 111, 940 N.W.2d at 298.

[16] *Id.* at 112, 940 N.W.2d at 299.

roughly 5 months and resulted in the return of her children to her care. Madison then independently cared for the children for approximately 6 months—from January to July 2018—and became overwhelmed after 2 months. Her progress and participation following the children's return was short lived, and the children were removed in July. The Court of Appeals focused on Madison's progress from September, when she began substance abuse treatment, through the termination hearing that concluded in February 2019. But Madison began that substance abuse treatment 1 month before the filing of the termination motion. Since at least February 1, 2017, she had been ordered by the court to complete outpatient treatment for substance abuse. Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights.[17]

The Court of Appeals excused Madison's initial inability to progress due in part to her abusive relationship with Jaden. The court stated that Madison made "overall progress" after ending that relationship.[18] But it took Madison several months after ending her relationship with Jaden to begin participating with services. And, as we noted above, shortly after the children were placed with Madison, her progress went downhill. She used methamphetamine. She stopped cooperating with drug tests and other services. She avoided communication with her caseworker. Rather than showing continued progress, Madison's involvement in services has fluctuated. At the time of trial, she was on an upward trend, but her history makes it difficult to believe she is committed to make sustained progress. While we are sensitive to the abuse suffered by Madison, our focus is on the children's best interests.

The Court of Appeals also downplayed Madison's "questionable choices," stating that "most of these choices occurred

---

[17] *In re Interest of Alec S., supra* note 7.

[18] *In re Interest of Leyton C. & Landyn C., supra* note 1, 28 Neb. App. at 108, 940 N.W.2d at 297.

before she engaged in mental health and substance abuse treatment."[19] We have trouble reconciling that statement with the evidence that Madison tested positive for methamphetamine in September 2018, tested positive for a nonprescribed medication twice in October, and was still spending time with Riley in October following his release from jail.

The State contends that the Court of Appeals erred by taking Madison's testimony at face value and failing to consider the juvenile court's assessment of credibility. The juvenile court specifically stated that Madison had "struggled with honesty" regarding her drug use and intimate partners. Even so, the Court of Appeals expressed reluctance to "discredit" Madison's denial of any drug use after early September 2018.[20]

The evidence warrants deferring to the juvenile court's assessment of Madison's credibility. According to Goodman, honesty is pivotal to having a positive outcome in a therapeutic relationship. It appears that after Madison told Goodman that she "wanted to find somebody who wasn't involved in any criminal activity, that did not use any drugs," Madison became involved with Riley—somebody involved in criminal activity who used drugs. At trial, Madison admitted that she was not honest with her caseworker or her treatment team about her relationship with Riley. Worley discussed the importance of being honest in treatment. Although there was evidence that Madison and Riley discussed living together and exchanging rings, Madison had not shared that information in therapy with Worley. Madison lied about Riley's being in her apartment during a visit with the children. She admitted lying to the court about using drugs with Riley and lying to her family about her drug use. Worley believed that Madison was honest with her as far as drug use. Thus, Worley did not think that Madison voluntarily used drugs prior to March 2018. But at trial, Madison admitted that some of her drug use with Jaden was voluntary. And Madison told an evaluator in

---

[19] *Id.* at 109, 940 N.W.2d at 297.

[20] *Id.* at 110, 940 N.W.2d at 298.

November that she relapsed on methamphetamine in August, but the evidence showed that she used in March, April, and May.

Although the Court of Appeals highlighted Madison's youth and expressed awareness that "children should not be suspended in foster care awaiting uncertain parental maturity,"[21] we agree with the State that this is not a case where the children should be forced to forgo permanency and linger in foster care. Leyton has been placed with Madison's mother, then with Madison's sister, then with a nonrelative foster family, then with Madison, and then back to the foster family. Landyn has been placed with the nonrelative foster family, then with Madison, and then back to the foster family. Goodman testified that "the more removals from a primary caregiver[,] the increase of traumatic response for children." Leyton's therapist testified that Leyton was experiencing anxiety and had a history of nightmares and night terrors.

[7,8] We have stated that when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights.[22] The 15-month condition contained in § 43-292(7) provides a reasonable timetable for parents to rehabilitate themselves.[23] Madison has failed to do so. Upon our de novo review of the record, we conclude that the Court of Appeals erred in finding that the State failed to prove by clear and convincing evidence that the termination of Madison's parental rights was in the children's best interests. We reverse the Court of Appeals' decision in that regard.

---

[21] *Id.* at 112, 940 N.W.2d at 299.

[22] See, e.g., *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008); *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007); *In re Interest of Phoenix L.*, 270 Neb. 870, 708 N.W.2d 786 (2006), *disapproved on other grounds, In re Interest of Destiny A. et al., supra* note 22.

[23] See *In re Interest of Alec S., supra* note 7.

Statutory Grounds

[9] Upon reversing a decision of the Court of Appeals, we may consider, as we deem appropriate, some or all of the assignments of error the Court of Appeals did not reach.[24] Due to its conclusion that the State failed to prove termination was not in the children's best interests, the Court of Appeals did not address whether statutory grounds for termination existed.

The juvenile court determined that the State proved grounds as to both children under § 43-292(2), (4), and (6), and as to Leyton under § 43-292(7). We begin with consideration of whether the State proved by clear and convincing evidence that Madison "substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection."[25]

[10] The evidence presented at the termination hearing demonstrated that Madison failed to provide her young children with necessary parental care and protection for a prolonged period of time. We recognize that one need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2).[26] During Madison's relationship with Jaden, which lasted over 1½ years, she left Leyton with her parents, visiting him infrequently. Landyn was placed out of Madison's care for nearly the first year of his life. He has spent a mere 6 months in Madison's care.

[11] A parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect.[27] Madison's drug use has impeded the ability to return the children to her care. She began using methamphetamine prior to Leyton's adjudication and continued using the drug up until the month prior to the filing of the motion to terminate parental rights. She continued using

---

[24] *McEwen v. Nebraska State College Sys.*, 303 Neb. 552, 931 N.W.2d 120 (2019).

[25] See § 43-292(2).

[26] See *In re Interest of Joseph S. et al., supra* note 14.

[27] *Id.*

this drug even though services were offered to help her and even after beginning substance abuse treatment. Further, she exposed the children to drugs as evidenced by Landyn's meconium testing positive and by the results of their hair follicle tests. She also subjected the children to individuals who posed a danger and who used methamphetamine and other drugs. Madison failed to consistently participate in family services offered to help her reunite with her children.

[12] The State proved by clear and convincing evidence that Madison neglected to provide necessary parental care and protection for her children. Any one of the bases for termination of parental rights codified by § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child.[28] Having determined that the State proved a statutory ground enumerated in § 43-292, we need not consider the sufficiency of the evidence concerning the other statutory grounds for termination identified by the juvenile court.[29] Because the State proved both that a statutory ground existed for termination of Madison's parental rights and that termination of such rights was in the children's best interests, the Court of Appeals erred by reversing the juvenile court's judgment.

## CONCLUSION

Upon our de novo review of the record, we conclude that the State adduced clear and convincing evidence that termination of Madison's parental rights was in the children's best interests. Because we also determine that the State proved a statutory ground for termination, we reverse the decision of the Court of Appeals and remand the cause with direction to affirm the judgment of the juvenile court.

Reversed and remanded with direction.

---

[28] *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020).

[29] See *id.*