IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ALEXANDER B. & LILLIAN B.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ALEXANDER B. AND LILLIAN B., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LARRY S., APPELLANT.


Filed September 24, 2024.    No. A-24-106.


Appeal from the Separate Juvenile Court of Sarpy County: JONATHON D. CROSBY, Judge. Affirmed.

Casey M. Randall, of Randall Law, L.L.C., for appellant.

Joni Scheef, Deputy Sarpy County Attorney, for appellee.


PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Larry S. appeals from an order of the separate juvenile court of Sarpy County terminating his parental rights to two of his children. Larry argues that the court erred in finding that the termination of his parental rights was in the best interests of his minor children. Following our de novo review of the record, we affirm the juvenile court's order.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Larry is the biological father of Alexander B., born in March 2016, and Lillian B., born in July 2013. Shelby B., the biological mother of both children, died in 2020. The Nebraska

Department of Health and Human Services (DHHS) has been involved with the children intermittently since Lillian was born.

A report made on January 4, 2022, alleged that Larry was using methamphetamine while caring for Alexander and Lillian. The report also stated that Larry allowed strangers to enter the family home while the children were present. One stranger allegedly stole Larry's wallet, phone, and his mother's car.

In response, on January 12, 2022, the State filed a juvenile petition alleging that Alexander and Lillian were juveniles as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The petition contained the following allegations: (1) that Larry used alcohol and/or illegal substances; (2) that Larry failed to provide the children with proper care, supervision, support, and/or safety; (3) that Larry failed to provide the children with safe, stable, and/or appropriate housing; and (4) due to the above, the children were at risk of harm. The State also filed a motion for ex parte removal of the children. The court granted the motion, and the children were removed from Larry's care that same day. The children were placed with their maternal grandparents, Robin S. and Dimitri S.

At an adjudication hearing on March 7, 2022, Larry admitted to the State's allegations that he was using alcohol and/or illegal substances, that he failed to provide the children with proper care and supervision, and that due to his actions, the children were at risk of harm. The court accepted Larry's plea, and the remaining allegation, that Larry failed to provide the children with appropriate housing, was dismissed. The court found that it was in the children's best interests to remain in the temporary custody of DHHS. Meanwhile, the court ordered Larry to: (1) complete a chemical dependency evaluation and follow the accompanying recommendations, (2) complete a psychological evaluation and follow the accompanying recommendations, (3) comply with random and frequent urinalysis screening at the discretion of DHHS, (4) sign releases for all providers as they relate to the ordered evaluations and any other rehabilitative efforts, and (5) participate in family therapy when determined appropriate by the children's therapist.

An order of disposition was entered on May 6, 2022, which continued the children in foster care, adopted the case plan submitted by DHHS, and ordered that the permanency objective of the case was reunification. The court ordered that all previous orders remained in full force and effect and that Larry was required to satisfy those orders.

During the pendency of the case, five review hearings were held, occurring on July 6 and September 9, 2022; and January 11, April 11, and July 25, 2023. At the July 6, 2022, review hearing, Larry failed to appear. DHHS motioned to continue the hearing, and the hearing was continued to September 9. Larry failed to appear at the September hearing. The juvenile court found that Larry was not engaged in services and not having contact with case management or his attorney. The court concluded that Larry was making poor progress toward reunification. The court ordered Larry to complete his evaluations and added a parenting assessment to the psychological evaluation. The court also ordered Larry to sign the necessary releases, participate in individual therapy, actively participate in supervised parenting time, obtain and maintain safe and stable housing, and maintain a legal source of income.

At the January 11, 2023, review hearing, the juvenile court again found that Larry was making poor progress toward reunification. The court modified the permanency objective to

adoption with a concurrent plan of reunification. The court ordered Larry to satisfy all previous court orders and to complete relinquishment counseling.

Larry failed to appear at the April 11, 2023, review hearing. The court found that Larry continued to make poor progress toward reunification "to include not making contact with case professionals or following through with court ordered services." All previous orders remained in full force and effect.

On May 26, 2023, the State filed a motion for termination of Larry's parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016). As to § 43-292(2), the petition alleged that Larry had substantially and continuously or repeatedly neglected and refused to provide the children with necessary parental care and protection. As to subsection (4), the petition alleged that Larry was unfit by reason of debauchery, habitual use of alcohol or narcotic drugs, or lewd and lascivious behavior which is seriously detrimental to the health, morals, or well-being of the children. The allegations under subsection (6) alleged that reasonable efforts had been made to preserve and reunify the family, but Larry failed to correct the conditions leading to the adjudication in that he had: (A) not participated in relinquishment counseling; (B) failed to complete substance abuse treatment; (C) failed to complete a psychological evaluation; (D) failed to participate in individual and/or family therapy; and (E) failed to consistently submit to random and frequent urinalysis screenings. The petition next alleged that termination was appropriate under subsection (7) in that the children had been in out of home placement for 15 or more months of the most recent 22 months. Finally, the State asserted that terminating Larry's parental rights was in the best interests of both Alexander and Lillian.

The final review hearing occurred on July 25, 2023. Larry failed to appear because he was incarcerated in Iowa. Larry's counsel informed the court that a year prior, Larry had been convicted of driving under the influence. Larry's counsel then stated that Larry was recently arrested for violating certain terms of his probation; Larry failed to pay probation fees and failed to complete a driving awareness course. The children's guardian ad litem also informed the court that Larry had at least one warrant for arrest in Douglas County, Nebraska.

The hearing continued in Larry's absence. The court did not make an explicit finding as to Larry's progress, but the DHHS case report indicated that he had made fair progress during this period. The court ordered Larry to comply with all prior orders and to complete a parenting class.

2. TERMINATION HEARING

On August 30, 2023, a first appearance on the State's motion for termination of Larry's parental rights was held. Larry failed to appear.

Trial on the State's motion was held over the course of two days on November 28, 2023, and December 19, 2023. As a preliminary matter, and due to Larry's prior failure to appear, the court advised Larry of his rights. Additionally, at the State's request, the court took judicial notice of its previous findings and orders in the case. The following evidence was then adduced by the State. Larry rested without presenting evidence to the court.

(a) Prior DHHS Involvement

Five DHHS court reports and accompanying case plans were prepared throughout the pendency of this case, and all five reports were received as exhibits during the adjudication. In

addition to providing updates on Larry's case progress, the reports also detailed DHHS' prior involvement with the family. In 2004, a report alleged that Larry sexually assaulted a minor child. Law enforcement investigated, and Larry was subsequently charged with and convicted of sexually assaulting a minor child. In 2014, a report alleged that Larry and Shelby committed domestic violence and abused substances in the family home. The report was investigated, and Lillian was temporarily removed from her parents' care. After Larry and Shelby completed the required services and treatments, Lillian was returned to their care.

In May 2016, a report alleged that Larry was using and selling methamphetamine. DHHS investigated, and the children were determined to be safe. In September 2018, when the children were both younger than age 7, a report alleged that Larry had left them in a car while he visited a store. Larry was cited by law enforcement for child neglect. In February 2019, a report alleged that Larry was using illegal substances. The report was investigated, and the children were determined to be safe.

In September 2021, it was reported that Larry had physically neglected the children. It was alleged that he had dropped them off late to school and was also late for after-school pick up. School officials contacted law enforcement, and the children were released to their maternal grandmother. Larry eventually arrived at the school and spoke to law enforcement. Among the topics discussed between the police officers and Larry was his drug use. The January 2022 report that led to the opening of this case was also detailed in the reports.

(b) Larry's Case Progress

At the termination hearing, three DHHS case managers and several other case professionals testified to Larry's progress throughout the case. Rose Vankat was the case manager from March 2022 to June 2022. Kerrin Packard was the case manager from June 2022 to July 2023. Alea Binkley began managing the case in July 2023 and was still in that position at the time of the termination hearing. Other witnesses involved in the case will be identified as necessary below.

The case managers testified that Larry failed to timely satisfy many of the court's orders. As stated above, in its March 2022 and subsequent orders, the court ordered Larry to participate in several services, including family therapy, a chemical dependency evaluation, and a psychological evaluation with a parenting assessment component. The record demonstrates that Larry was never required to participate in family therapy because the children were never placed into therapy outside of school counseling. However, Larry was required to satisfy the remaining orders. Larry did not complete a chemical dependency evaluation until January 12, 2023. Larry did not complete a psychological evaluation until September 2023. The psychological evaluation he completed did not include a parenting assessment.

In September 2022, the court also ordered Larry to participate in individual therapy, obtain and maintain safe and stable housing, and maintain a legal source of income. Larry did not begin participating in individual therapy until shortly before the termination hearing in October 2023. Regarding Larry's housing, Packard testified that Larry was living in his mother's home with his mother, one adult male, and one adult female. During her first year as case manager, Packard was not allowed to visit or assess Larry's residence. Packard was finally granted access to the home in June 2023, and background checks were completed on each adult living in the home. The adult female, who was identified as Larry's girlfriend, did not pass the background check and was not

considered to be a safe person to be present with the children. At some point around or after July 2023, Larry's girlfriend moved out of the home.

Regarding the order to maintain legal employment, Packard testified that around March 2023, Larry was technically employed, but that there were barriers to his employment. To be given work assignments, Larry's employer required Larry to seek substance use treatment and to provide evidence that he was not abusing his children. Packard testified that in June 2023, Larry reported that he was actively working. Binkley testified that between July 2023 and November 2023, Larry maintained his employment. However, the day before trial, Larry informed Binkley that he had been fired from his job.

In January 2023, the court ordered Larry to complete relinquishment counseling. Larry completed relinquishment counseling in April 2023. In July 2023, the court also ordered Larry to complete a parenting class. Binkley testified that Larry began a parenting class in August 2023 but was unsuccessfully discharged two months later for failing to attend appointments.

Additionally, in several of its review orders, the district court found that Larry's communication with case professionals was lacking. The case reports detailed several incidents where Larry failed to appear for scheduled appointments, failed to appear for visitation, failed to reschedule missed or canceled appointments, and generally failed to keep in contact with his case managers. Packard testified that despite her efforts to contact Larry, she was unable to talk or meet with him during her first 4 months on the case. Throughout Packard's year-long management of the case, she met with Larry only twice: once in January 2023 and once in June 2023.

Ashley Manchester, a family support worker, testified that she had worked with Larry between June 2023 and October 2023. Her role was to assist Larry with his court orders, provide him with resources, and be the bridge between him and other case professionals. Manchester testified that Larry had three initial treatment goals, which were to complete substance abuse treatment, complete a parenting course, and create and maintain a budget. In October 2023, Manchester requested a discharge of all family support services due to Larry's lack of engagement. Manchester testified that at this time, Larry had not achieved any of his three treatment goals. She further testified that at the time of discharge, Larry was still working on basic parental goals.

Packard testified that during her year-long management of the case, Larry failed to correct the conditions that led to his children's removal. She believed that it would be in the children's best interests to achieve permanency through adoption with their maternal grandparents. She based this decision on multiple factors, including Larry's delays in completing court orders, the length of time the children had been out of the home, and concerns that Larry was using methamphetamine. Although Packard reported that Larry had made fair progress between March 2023 and July 2023, she testified that she was still concerned about his ability to address Alexander's behaviors. Packard further testified that she was concerned about Larry's home situation, including his monetary losses from gambling, his sporadic employment, and the nonfamilial individuals living in the home. She testified that if placed in this environment, the children would be in the care of inappropriate individuals and exposed to dangerous situations.

Binkley also testified that during her management of the case, Larry had not corrected the conditions that led to the removal of the children. Binkley testified that since the last review hearing in July 2023, Larry had made poor progress toward reunification. She explained that

"we've been in at the same level of effort for [Larry] for a while on this case, and I think we would expect to see a bit more improvement from where we are at and how long it has been opened."

Binkley testified that Larry inconsistently attended visitation, inconsistently completed urinalysis testing, and failed to satisfy long-standing court orders. She further testified that since July 2023, Larry had contact with law enforcement twice. The first incident was his July 2023 arrest for violating probation, and the second incident was a car accident that occurred near the time of trial. Binkley testified that Larry should not have been driving because he did not have proof of insurance or proof of ownership over his vehicle. For all these reasons, Binkley believed that it would be in the best interests of the children to terminate Larry's parental rights and allow their maternal grandparents to adopt them.

### (c) Visitation

The case managers described Larry's visitation throughout the case as sporadic and inconsistent. Packard estimated that Larry attended between 40 and 63 percent of all scheduled visits. At the outset of the case, Larry was offered supervised visitation twice a week, but because of his repeated cancellations and "no shows," his visitation was reduced to one 2-hour session per week. Vankat testified that in the initial months of the case, the agency reported a lack of interaction between Larry and the children. In April 2022, the visitation agency discharged Larry from its program because he repeatedly canceled appointments and failed to engage in services. In June 2022, a different visitation agency began supervising Larry's visits.

In addition to his agency supervised visitation, Larry was offered visitation at the children's foster home supervised by the children's maternal grandmother and foster parent, Robin. However, Vankat testified that Robin reported that Larry was not sufficiently engaging with the children during visitation. Robin raised this issue again to Packard when she took over the case, and in response, Packard recommended to the court that all future visits occur at public locations under agency supervision. The court adopted her recommendation in September 2022.

Joseph Elliott, a family service specialist, began supervising Larry's visits in June 2022. Elliott testified that during visits, Larry took Alexander and Lillian to public places such as museums, parks, and pools. Elliot testified that Larry occasionally fed the children during visits. Elliot testified that Larry did not assist the children with school projects or homework and that he did not attend doctor appointments or school functions. Elliott also testified that Larry was not always able to redirect the children when they behaved inappropriately, namely Alexander. Nonetheless, Elliot testified that there was a bond between Larry and the children.

Packard testified that between March and July 2023, Larry requested additional visits with the children. Packard proposed that the weekly visit be lengthened to 4 hours, and if those 4-hour visits went well, a 2-hour, after-school, weekday visit would be added to the schedule. During the first 4-hour visit, the visitation worker reported a problem and recommended returning to the 2-hour structure. After this incident, Larry's visitation never expanded beyond fully supervised, 2-hour, once a week visits in public places.

### (d) Robin's Testimony

Robin, Alexander and Lillian's maternal grandmother, has been one of the children's foster parents since January 2022. Robin testified that by January 2024, the children will have been

placed in her home for 2 years. She testified that since being in her care, Alexander has "significantly progressed" in school, and "Lillian thrives in everything she does."

Robin testified that the children have a scheduled visit with Larry every Saturday, but that on average they see Larry twice a month because he often cancels. Robin explained that when Larry cancels, Alexander becomes anxious and wants to call Larry to remind him of the visit. Robin testified that Lillian deals with canceled visits "very well" because she "knows not to get her hopes up." Robin further testified that Larry does not have contact with the children outside of supervised visitation. She explained that he does not call or video chat with the children.

Regarding the permanency of the children, Robin expressed concern with Larry's sex offender status. She believed that his criminal history would affect the children's ability to have sleepovers with friends and would more generally impact their home environment.

(e) Substance Use

Larry's methamphetamine use led to the removal of his children from his home. Vankat testified that in March 2022, Larry admitted to using a substance, but did not specify what kind of substance. That same month, Larry was charged with driving under the influence in Iowa, and he was later convicted of that offense.

The case managers testified to Larry's participation in urinalysis testing, and several urinalysis report sheets were received as exhibits. In February 2022, Larry missed two of three tests. In March 2022, Larry missed one of eight tests. In April 2022, Larry missed four of nine tests. Packard testified that from June to September 2022, Larry missed approximately 11 out of 33 urinalysis tests. The tests that Larry did complete during these months tested negative for all substances. However, both Vankat and a drug testing supervisor testified that when clients are not in total compliance with drug testing, it suggests that they are using drugs.

In December 2022, Larry was discharged from urinalysis testing due to his lack of participation. Larry failed to comply or respond to the testing company for a period of 30 or more consecutive days. At the request of DHHS, Larry was readmitted to urinalysis testing in March 2023. During the March to July 2023 review period, Larry missed 13 urinalysis tests. The 24 tests that he did complete were negative for all substances.

In January 2023, Larry completed the substance use evaluation ordered by the court. During the evaluation, Larry admitted to using methamphetamine, marijuana, and alcohol in 2022 and early 2023. He also admitted to having a gambling issue. He reported that he visited the casino twice a week and that he had lost over $20,000 in the past year from gambling.

The evaluation determined that the ideal level of care for Larry was participation in a long-term, residential treatment program. However, because of Larry's sex offender status, Larry was not likely to be accepted into any residential programs. The evaluation concluded that the next best level of care was an intensive outpatient substance use treatment program. Packard attempted to find Larry a suitable program. As predicted, Larry was not admitted into an inpatient treatment facility due to his sex offender status.

Nevertheless, in March 2023, Packard found a suitable intensive outpatient program and recommended it to Larry. Larry enrolled in the program in June 2023. Around this time, Larry also voluntarily banned and barred himself from all casinos in Iowa.

In July 2023, Larry was unsuccessfully discharged from the intensive outpatient program for missing too many sessions. Binkley testified that in October 2023, Larry enrolled in a new, 6-week intensive outpatient program, but that she was not made aware of his enrollment until he had almost completed the program. Larry successfully completed the program in November 2023. Binkley testified that she still had concerns about Larry's drug use because she did not have an opportunity to discuss Larry's history with the program directors. In addition, Binkley had not received a program discharge summary due to Larry's failure to sign a release of information form. This meant that Binkley was unaware of Larry's treatment plan, what goals he had during the program, or what was included in his discharge recommendations.

Furthermore, based on the two in-person meetings Binkley had with Larry, Binkley was concerned that Larry was actively using drugs. She testified that during their first meeting in August 2023, "he had a lot of sores on his arms and on his face, and then throughout [the] visit he was actively picking some sores on his face and he was bleeding as well." She testified that during the second meeting in October 2023, "he wasn't actively picking . . . but there were new scabs that were different from the last time [she] had seen him." Based on her training and experience, Binkley testified that Larry's marks and scabs indicated methamphetamine use. During both meetings, Larry denied using methamphetamine.

### 3. JUVENILE COURT ORDER

At the close of the evidence, the juvenile court took the matter under advisement. On January 17, 2024, the court issued its order terminating Larry's parental rights to both Alexander and Lillian. The court noted that Larry had only recently made efforts to abide by the court's orders, communicate with case professionals, and attend hearings consistently. The court observed that those recent efforts fell "woefully short of what is expected or required of a parent." After reviewing the evidence presented at the hearing, the court found that Larry had failed to correct the conditions which led to the children being removed from his care and that he lacked the ability to safely and independently parent his children. The court also found that the State had met its burden of proof as to the statutory grounds alleged in the motion and that termination was in Alexander and Lillian's best interests.

Larry appeals.

### III. ASSIGNMENTS OF ERROR

Larry assigns that the juvenile court erred in finding that termination of his parental rights was in the children's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

- 8 -

## V. ANALYSIS

Termination of parental rights is a two-part inquiry. To terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of the evidence concerning the State's other bases for termination. *Id.*

### 1. STATUTORY GROUNDS

The State sought termination of Larry's parental rights under § 43-292(2), (4), (6), and (7). The juvenile court found that the State proved that Alexander and Lillian were minor children within the meaning of § 43-292(2), (4), (6), and (7) by clear and convincing evidence. Larry concedes that § 43-292(7) has been satisfied. After our de novo review of the record, we agree.

Section 43-292(7) allows for termination of parental rights if the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. The Supreme Court has held that this subsection operates mechanically, and thus, it does not require the State to adduce evidence of any specific fault on the part of the parent. *In re Interest of Mateo L. et al., supra*.

In this case, Alexander and Lillian had been in an out-of-home placement for 15 or more months of the most recent 22 months as of the time of trial. More precisely, they were removed from Larry's care on January 12, 2022. Since that day, they remained with their maternal grandparents in out-of-home placement. As of the first day of the hearing, the children had been in out-of-home placement for over 22 months. Accordingly, the requirements of § 43-292(7) were met.

Having found that there is clear and convincing evidence that termination of Larry's parental rights was warranted pursuant to § 43-292(7), we need not address the sufficiency of the evidence to demonstrate that termination was also warranted pursuant to § 43-292(2), (4), or (6).

### 2. BEST INTERESTS

Having declined to address the sufficiency of the evidence demonstrating that termination was also appropriate pursuant to § 43-292(2), (4), or (6), we treat our discussion of whether termination of Larry's parental rights is in the children's best interests as though § 43-292(7) is the only statutory basis for termination. When termination is based solely on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination is, in fact, in the child's best interests. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). This is because § 43-292(7) does not require proof of any specific fault by the parent, such as abandonment, neglect, unfitness, or abuse, as other subsections require. *Id.*

A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of

a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

The law does not require perfection of a parent. *In re Interest of Leyton C. & Landyn C., supra*. Instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* The Supreme Court has recognized that one's history as a parent speaks to one's future as a parent. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

Larry argues that the State failed to present sufficient evidence proving that termination of his parental rights was in the children's best interests. He further argues that the progress he made during the pendency of the case and the bond that he shares with his children show that he is a fit parent. We disagree.

The evidence presented at the hearing demonstrates that Larry has made little progress toward reunification with his children. In short, Larry has failed to meaningfully participate in this case. Since the children were removed from his care in January 2022, Larry has consistently missed scheduled visitations, skipped numerous urinalysis exams, severely delayed satisfying court orders, failed to communicate with case professionals, and failed to attend several court dates. Due to his lackluster engagement in services, Larry was discharged from several programs, including visitation services, urinalysis testing, family support services, a parenting course, and his first intensive outpatient treatment program.

Larry's case managers rated his progress as poor at every review hearing until July 2023, two months after the State filed its motion to terminate his parental rights. This was the first time that Larry's progress toward reunification was deemed fair. However, even during this more productive period, Larry was still sporadically engaging in visitation and drug testing, and he still had several longstanding court orders which he had yet to address and more that had not been fulfilled. Further, between July 2023 and November 2023, Larry fell back into old patterns, and his progress was again determined to be poor. Larry's noncommittal efforts show that he is unwilling or incapable of participating in the necessary services that would demonstrate a concerted effort to reunify with Alexander and Lillian.

Larry's substance abuse led to the removal of both children, and the evidence demonstrates that this issue was not remedied during the pendency of this case. Despite the court's order to comply with all screenings, Larry skipped numerous urinalysis exams. While we acknowledge that every exam Larry did take was negative for drug use, we find little solace in these results given Larry's pattern of missing a significant number of exams. The professionals involved in this case noted that when a client misses exams, it suggests that the client is using drugs. Moreover, there were other occurrences that indicated Larry was using drugs. Larry admitted to Vankat that he used a "substance" in March 2022. He admitted using alcohol, marijuana, and methamphetamine through the end of 2022 and slightly into 2023 in his substance abuse evaluation. Finally, in the latter half of 2023, Larry's physical appearance, including marks, scabs, and sores covering his skin, indicated to his case manager that he was using methamphetamine.

Larry's completion of the intensive outpatient treatment program was a positive step forward in his recovery. However, this achievement was made only a month before the termination hearing. Further, Larry's case manager was unable to communicate with the program directors

during Larry's participation, and she did not receive a discharge summary detailing his performance. Thus, she did not know the extent of the program's knowledge of Larry's drug use history, and she could not testify to the specifics of his program performance or his discharge recommendations.

Throughout this case, Larry has also been unable or unwilling to lead a law-abiding life. In March 2022, Larry was cited for driving under the influence in Iowa. In July 2023, Larry was incarcerated for violating the terms of his probation. Additionally, during that same time, Larry had at least one active warrant for his arrest in Douglas County, Nebraska.

We acknowledge that the evidence showed that Larry shared a bond with Alexander and Lillian. However, this fact is not enough to negate the overwhelming evidence that Larry is an unfit parent. By the maternal grandmother's estimations, during the past two years, Larry has seen his children approximately twice a month. This is particularly concerning given that Larry had the opportunity to visit his children once a week. A 50-percent attendance rate does not suggest parental fitness.

Larry's visitation never developed beyond a 2-hour, once a week, agency supervised session. The first and only time Larry attempted a 4-hour visit, the visit ended after 2 hours, and visits returned to the 2-hour structure. We can only conclude from this that Larry has not developed the tools necessary to be a full-time parent to Alexander or Lillian. He has failed to routinely attend the bare minimum hours of visitation. He does not call or contact the children outside of these hours. He has not attended doctor appointments or school functions or assisted the children with homework. In short, he has not shown an ability to prioritize his children's needs over his own.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Larry had over 22 months to rehabilitate himself. Despite the numerous efforts made by the court and various case professionals, Larry failed to do so within a reasonable time. There was no evidence that Larry had improved his parenting skills or fully and adequately addressed the factors that led to the removal of the children. Meanwhile, the evidence shows that Alexander and Lillian have thrived under the care of their maternal grandparents. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Therefore, upon our de novo review, we conclude that the State proved by clear and convincing evidence that the termination of Larry's parental rights was in the best interests of both Alexander and Lillian.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Larry's parental rights to Alexander and Lillian.

AFFIRMED.