IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF AUSTIN M. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF AUSTIN M. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JALISA M., APPELLANT.


Filed November 9, 2021.     No. A-21-094.


Appeal from the County Court for Gage County: CURTIS L. MASCHMAN, Judge. Affirmed.

Lee Timan, of Nelson, Clark & Timan, P.C., for appellant.

Roger L. Harris, Gage County Attorney, and Michael W. Wehling for appellee.


RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

### INTRODUCTION

Jalisa M. appeals from the decision of the county court for Gage County, sitting as a juvenile court, terminating her parental rights to her three children. We affirm.

### BACKGROUND

#### PROCEDURAL BACKGROUND

Jalisa is the mother of Jordan M., born in 2012; Austin M., born in 2013; and Bailey M., born in 2016. Michael M. is the father of the children. The State also sought to terminate Michael's parental rights to the children, and the record reflects that he ultimately relinquished his parental rights. Because Michael is not part of this appeal, he will only be discussed as necessary.

- 1 -

According to the Nebraska Department of Health and Human Services (DHHS) court reports in our record, an intake was accepted for initial assessment on March 8, 2018, for the physical abuse of Jordan and Austin by Jalisa. The March intake was "court substantiated," and it appears that there was a separately docketed juvenile case filed. Family support services and intensive family preservation services were provided to Jalisa. Jalisa also completed a substance abuse evaluation that recommended an intensive outpatient program. Another intake was accepted for initial assessment on October 22 for the physical neglect of Bailey by Jalisa. The intake alleged that Jalisa's new boyfriend, Joshua L., was residing in the home; that he was on probation; and that he had relapsed on methamphetamines. The intake also alleged that Jalisa appeared to be under the influence of methamphetamines.

The State filed a petition on November 6, 2018, alleging that the children fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they lacked proper parental care by reason of the fault or habits of Jalisa, and because Jalisa placed them in a situation dangerous to life or limb or injurious to their health or morals. The State specifically alleged: DHHS attempted to provide multiple services for the family, however, Jalisa did not follow through with the services; on August 26, Jalisa was arrested for possession of methamphetamines and Michael was arrested for possession of methamphetamines, child abuse, and domestic assault; a safety plan was put in place for the children, but it was not followed; Joshua L. was living with Jalisa and he had been testing positive for methamphetamines for probation and admitted to his probation officer that he was an IV user of methamphetamine and that Jalisa was seen under the influence of methamphetamines; DHHS scheduled intensive family preservation in the home, but Jalisa did not follow through with the sessions; DHHS had family support working with Jalisa, but she was not engaging in services; and Jalisa was scheduled to start an intensive outpatient program for substance abuse on October 29, but she did not attend.

On November 19, 2018, the children were adjudicated as being within the meaning of § 43-247(3)(a) based on Jalisa's admission to the allegations in the petition. The children were placed in the temporary legal custody of DHHS, with physical placement in Jalisa's home. The juvenile court ordered a chemical dependency evaluation of Jalisa. The disposition hearing was set for December 21.

The disposition hearing was held on December 21, 2018. At the hearing, the juvenile court said it was going to adopt the DHHS case plan that was received into evidence. The court stated that legal custody would continue with DHHS, with physical placement in the home. The court also stated that Jalisa was to: not consume or possess any alcoholic beverages or controlled substances unless prescribed by a physician, and submit to testing; immediately enroll, faithfully attend, and successfully complete an intensive outpatient chemical dependency treatment program; keep the children's residence in a reasonably orderly, sanitary, and safe condition; allow visitation by DHHS personnel during reasonable hours; seek or maintain suitable employment; complete a family support assistance program provided by DHHS; and cooperate with DHHS personnel and other service providers. The juvenile court's written disposition order does not appear in our record, nor was it requested in the praecipe.

The children were removed from Jalisa's home on December 28, 2018, after she tested positive for methamphetamine through her probation. The children were placed in a kinship foster

home with people known to the children's maternal grandmother; the children have remained in that foster home.

After a review hearing on June 25, 2019, the juvenile court adopted the provisions of the DHHS case plan of June 17, and directed all parties to comply with its terms including any court ordered amendments. According to the case plan, Jalisa was to obtain a safe and stable home for herself and her children, obtain employment, participate in family support, successfully complete inpatient treatment for substance abuse, maintain her sobriety, complete a mental health assessment and follow all recommendations, and participate in a parenting class. The court also ordered Jalisa to immediately enroll, faithfully attend, and successfully complete an inpatient chemical dependency treatment program. After a review hearing in November, the court ordered Jalisa to enter and successfully complete an inpatient chemical dependency treatment program as soon as it became available. After a review hearing on May 18, 2020, the juvenile court adopted the provisions of the DHHS case plan of May 12, and directed all parties to comply with its terms; the requirements for Jalisa remained the same as in earlier case plans.

On June 19, 2020, the State filed a motion to terminate Jalisa's parental rights to Jordan, Austin, and Bailey pursuant to various subsections of Neb. Rev. Stat. § 43-292 (Reissue 2016). On July 30, the State filed an amended motion to terminate Jalisa's parental rights to the children pursuant to § 43-292(1), (2), (4), (6), (7), and (9). The State alleged that: Jalisa abandoned the children for 6 or more months immediately prior to the filing of the motion; Jalisa substantially and continuously or repeatedly neglected the children and refused to give them necessary parental care and protection; Jalisa was unfit by reason of habitual use of intoxicating liquor or narcotic drugs which conduct was seriously detrimental to the health, morals, or well-being of the children; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a); the children had been in an out-of-home placement for 15 or more of the most recent 22 months; Jalisa subjected the children to aggravated circumstances, including, but not limited to, abandonment; and termination was in the children's best interests.

TERMINATION HEARING

The hearing on the motion to terminate Jalisa's parental rights was held on January 15, 2021. The State called two witnesses. Jalisa called two witnesses to testify, and also testified in her own behalf. The guardian ad litem for the children then called one rebuttal witness. Several exhibits were also received into evidence. A summary of the relevant evidence follows.

Carmen Lee, a children and family services specialist with DHHS, testified that she was the initial caseworker assigned to this family in April 2018. At that time, there were allegations of child abuse that led to the first juvenile petition that was filed; if and how that juvenile case was resolved is not apparent from our record. Jalisa expressed that she got overwhelmed and stressed with the children, and that if she was overwhelmed and stressed she struggled to not use methamphetamine. She was offered family support services to help her maintain a safe and stable home for herself and the children and to develop appropriate parenting skills. Jalisa was also offered intensive family preservation, a 42-day program where she would work with a "skill builder" and a therapist for 10 hours each week to help her with parenting and substance abuse, but Jalisa did not complete the program.

Lee testified that in August 2018, Jalisa was arrested for possession of methamphetamine. An October substance abuse evaluation recommended an intensive outpatient program, but Jalisa did not do the program. The current juvenile petition filed in November involved substance abuse by Jalisa. According to probation officer Jason Cohorst's letter that was received into evidence, Jalisa was placed on traditional probation on December 21 for a period of 18 months for the offense of attempted possession of a controlled substance. Lee testified that on December 28, the children were removed from Jalisa and placed into a kinship foster home, where they have remained.

According to Lee, a second substance abuse evaluation in January 2019 recommended inpatient treatment for Jalisa. A court report authored by Lee states that Jalisa went to a facility for inpatient treatment twice, once in March and once in June, but on both occasions Jalisa was only at the facility for a couple of hours before walking out. Lee testified that in approximately August, Jalisa went to different facility and successfully completed the residential treatment program. An intensive outpatient program was recommended for Jalisa's aftercare to help her maintain her sobriety. Jalisa started an intensive outpatient program, but she did not complete it. Jalisa admitted to relapsing by using marijuana in September. According to Cohorst's letter that was received into evidence, Jalisa was sentenced on September 10 on a motion to revoke probation and her probation was extended to December 21, 2020; it is not clear from our record whether Jalisa's criminal sentence has been completed. Lee testified that she communicated with Cohorst, who kept her up to date on Jalisa's progress. According to Lee, Jalisa missed drug testing through probation in October and November 2019. And in February 2020 she relapsed by using methamphetamine. Jalisa again attended, and successfully completed, inpatient treatment in March. She went to a sober living facility for aftercare, but "got kicked out" due to relapsing on methamphetamines. In April, Jalisa "absconded" and Lee lost contact with her for approximately 3 weeks, during which time Jalisa missed visits with the children.

Lee testified that the children were in counseling for behavior issues. When the children were first removed from Jalisa's home in December 2018, she had supervised visits approximately 8 to 9 hours each week. However, in February 2019, visits were decreased to 4 hours per week because Jalisa did not consistently attend scheduled visits with the children. When Jalisa did not show up for visits, it was "very hard" on the children, they cried and wondered if they had done something wrong, and then had "behaviors" when they returned to the foster home. Lee was present during a few visits through June 2020 and observed the children "yelling, screaming, running . . . . not listening," and being mean to each other and to Jalisa; Jalisa would tell the children to behave, but they would not listen and she did not have a lot of control. The motion to terminate Jalisa's parental rights was filed on June 19. In September, Jalisa told Lee she got overwhelmed and was stressed at a visit, and that she was struggling to stay clean. Lee's last face-to-face interaction with Jalisa was approximately September, but Lee talked to her at the beginning of October. In October, Lee took a leave of absence from work.

Stephanie Berkebile was the DHHS caseworker assigned to this family at the end of October 2020, when Lee took a leave of absence. Berkebile testified that Jalisa made some recent progress, all within about the last 1½ months prior to the termination hearing. Visitation reports had "been better" over the "last month, couple of months." In November, "there were some struggles," but visits "were okay." "The visits in December were better, and in January [2021] so far they have been better." The visits took place in Jalisa's apartment and no concerns were noted.

And in the "last month, . . . month and a half," Jalisa asked to have her visits increased, but DHHS wanted to see several weeks of consistent visits and progress before doing an increase. DHHS was also "waiting to see what happens after court."

Berkebile also testified that Jalisa requested assistance to get a substance abuse/mental health evaluation paid for. According to Jalisa's testimony, she tried to make an appointment for the evaluation, but the provider would not let her self-pay because she was "dealing with the [S]tate," and she needed to get a letter of agreement from the State for payment. Berkebile testified that she contacted the letter of agreement team, who then asked Berkebile to verify Jalisa's "employment status, . . . does she have insurance through employment, what she made and where she was employed." Upon inquiry, Jalisa told Berkebile that she was employed (but did not say where), what she earned per month, and that she did not have insurance. Berkebile again reached out to Jalisa to find out the name of her employer, but Jalisa did not respond. Jalisa testified that "it's not that I . . . wasn't going to answer [Berkebile's] question," but with "everything else going on . . . I tend to forget sometimes." Because Berkebile could not verify the name of Jalisa's employer, DHHS could not provide a letter of agreement. The letter of agreement team told Berkebile to have Jalisa apply for Medicaid so that she could get the evaluation done. In her testimony, Jalisa confirmed that she was advised that she would have to get Medicaid to pay for the evaluation, but that she had "not yet" made any attempts to get enrolled in Medicaid.

Lee testified that Jalisa's case plan and goals have remained the same since approximately June 2018, but Jalisa had made little progress. At the time of the termination hearing, in January 2021, Jalisa was still at supervised visitation, 2 hours twice each week. When asked why Jalisa had not moved to less restrictive visitation, Lee responded, that at 2 hours, Jalisa still got "overwhelmed and stressed." Lee stated that in September 2020, Jalisa told her that "she got overwhelmed"; "She was stressed at the visit because she was struggling with using." Besides not progressing beyond supervised visitation, Jalisa had not completed a mental health assessment or a parenting class. Additionally, throughout the juvenile case, Jalisa lived with several different men who had lengthy criminal histories and/or had been involved with drugs. Jalisa was currently living with Joshua L., the man she had previously lived with at the time the current juvenile petition was filed in November 2018. Lee testified that Joshua told his probation officer that he was using methamphetamine, although it is not clear from Lee's testimony if this happened recently or back in 2018. Lee was concerned about Jalisa living with Joshua because "he's got a long history of methamphetamines, and he's had his rights terminated on children, on his children." Jalisa testified that she has known Joshua since September 2018, and they began dating and living together again in August 2020; according to Jalisa, Joshua has been sober since they got back together.

Lee believed that terminating Jalisa's parental rights was in the children's best interests because they have been out of the home for more than 2 years and they deserve stability and permanency. "Jalisa has had over two years to address the adjudication concerns, and she's made little progress."

Jalisa, 27 years old, testified that her children are all loving, really caring, and outgoing. Austin "tends to be a little bit more difficult," but "it stems from" "Mike's drug use or mine and not knowing which direction really to go with him, like, on ways to discipline him." When the children were in the home, Jalisa received family support and intensive family preservation services. She made statements to Lee about being overwhelmed and stressed about everything

going on, realizing that she was going to be a single parent and having a drug problem at the same time.

On August 26, 2018, Jalisa and the children's father were arrested on drug charges and she decided to end their relationship because he had been violent towards her and the children. Jalisa stated that she was honest with DHHS about her addiction problems. She recounted attending inpatient treatment four times, successfully completing treatment the last two times, most recently in January 2020, but admittedly relapsed shortly after completing her treatments. Jalisa stated that she hit rock bottom and realized that she could lose her family and herself to her addiction. She last used controlled substances on May 31, and she has been sober since that time. To stay sober, she changed the people that she associated herself with, changed her state of mind, went to "NA" meetings five times per week and ran two of those meetings, spent time with family, and kept her focus on her children.

Jalisa acknowledged that she was on probation for most of the last year for possession of a controlled substance. She "went up for revocation twice." According to Cohorst's letter that was received into evidence, on September 10, 2019, Jalisa was sentenced on a motion to revoke probation and probation was extended until December 21, 2020. A warrant was issued on May 29, 2020, due to Jalisa failing to appear in court for a motion to revoke probation; the warrant was served on June 13 and Jalisa began reporting to probation again as directed. Cohorst's letter, dated September 15, 2020, states that Jalisa reported and submitted all negative drug tests since she began reporting again on June 16. Jalisa testified that from June to October 2020 she was drug tested at least three to four times per week for probation and tested clean, met with her probation officer, did not violate her probation, and remained crime free. She stated that at the second revocation in October, for violations that occurred prior to June, she was near the end of her probation so the judge imposed a straight sentence wherein she served jail time. A foster care review board report received into evidence states that Jalisa's probation was revoked on October 1 and she was sentenced to 90 days in jail, but was given credit for 46 days served; she was scheduled to report to jail on October 23.

Jalisa has had supervised visits with her children two times each week for a total of 4 hours per week since June 2020. From June to November, visits took place out in the community or at the visitation provider's facility. Starting in November, visitations took place in Jalisa's apartment. She was not aware of any problems that were observed during her visits. Also in November, Jalisa asked about increasing her visits, but was told nothing was going to change until Lee got back from her leave of absence. Jalisa felt her visits had gone well in the month or two prior to the termination hearing and that she had displayed progress for increased visits. Jalisa believed she should currently be having at least 10 hours of visitation each week. Jalisa has a strong bond with her children and felt that she should be considered for reunification with her children in the near future.

Jalisa had not completed a parenting class, but it was her understanding that it was going to be difficult because of the COVID-19 pandemic restrictions. Jalisa made efforts to complete a mental health evaluation. She called to schedule an appointment, but when she showed up, she found out the provider was not doing in-person appointments, only virtual, so she had to cancel the appointment and make a new one, but had not yet heard back from the provider. She was willing to complete both the parenting class and the mental health evaluation. Jalisa had an

apartment, was employed, and earned enough income to provide for her financial obligations. Jalisa worked at a restaurant from June to October 2020, but then that restaurant closed. Two weeks later, she began working for her current employer, also a restaurant. Jalisa did not feel like DHHS had been helping her work towards reunification since sometime prior to the termination paperwork being filed.

Jalisa's mother and sister testified on her behalf. Both believed that in the 6 to 7 months prior to the termination hearing Jalisa had made a lot of progress. Both also believed that Jalisa's current relationship with Joshua was different than it had been in the past and that it was currently a positive relationship. Jalisa's mother and sister believed that she was capable of providing for the children and being a mother to them. Jalisa's mother observed Jalisa with the children numerous times in the 6 to 7 months prior to the termination hearing and she believed that Jalisa was a good mother and could "deal with [the children] now."

Marcia McCabe was called as a rebuttal witness by the children's guardian ad litem. McCabe provided the supervised visits and the previous family support for Jalisa, and worked with her from October 2019 until the time of the termination hearing. McCabe stated that when visits were out in the community in the summer of 2020, Jalisa struggled with the children "because they [were] going every which way," but visits in Jalisa's home were better. During some of the visits, Jalisa had projects or activities she wanted to do with the children. Other visits, the children would take turns having phone time and would watch TV when it was not their turn with the phone. The children would try to barter for more time or "sneak" Jalisa's phone if she told them no. The children appeared to enjoy being at visits with Jalisa. McCabe did not notice any signs of drug use or inappropriateness by Jalisa in the past 6 months.

JUVENILE COURT'S DECISION

In its journal entry and order entered on January 25, 2021, the juvenile court terminated Jalisa's parental rights to Jordan, Austin, and Bailey after finding by clear and convincing evidence that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7), and that termination of parental rights was in the children's best interests.

Jalisa appeals the juvenile court's order.

ASSIGNMENT OF ERROR

Jalisa assigns that the juvenile court erred by finding termination of her parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

ANALYSIS

STATUTORY GROUNDS FOR TERMINATION

In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the children's best interests. *In re Interest of Leyton C. & Landyn C., supra.*

In its order terminating Jalisa's parental rights to the children, the juvenile court found that statutory grounds existed pursuant to § 43-292(2), (6), and (7). Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months."

Jalisa concedes the evidence shows that grounds for termination of parental rights under § 43-292(7) were proven by sufficient evidence. We agree. The children were placed in a kinship foster home on December 28, 2018, and they remained there at the time of the termination hearing and order in January 2021. That period easily satisfies the 15-out-of-22 formula of § 43-292(7).

Any one of the bases for termination of parental rights codified by § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Leyton C. & Landyn C., supra.* Having determined that the State proved § 43-292(7) as a statutory ground for termination, we need not consider the sufficiency of the evidence concerning § 43-292(2) and (6). The next inquiry is whether termination is in the children's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit. *In re Interest of Leyton C. & Landyn C., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.*

The record is clear that from the time the juvenile petition was filed in November 2018 until June 2020, Jalisa made little to no progress in this case, mainly due to her drug addiction issues. However, since June 2020, she has shown some improvement. Admittedly, her progress began around the time that the State filed to terminate her parental rights. But in the 6 to 7 months before the termination hearing, Jalisa purportedly remained sober, got an apartment, and obtained employment. Her visits with her children had improved, particularly in the month or two prior to the termination hearing.

That said, Jalisa's case plan and goals have remained the same since approximately June 2018, and at the time of the termination hearing in January 2021, she still had not completed a mental health assessment or a parenting class. Jalisa cited the COVID-19 pandemic restrictions as

a reason for not completing the parenting class, and a miscommunication as the reason she was not able to complete a recently scheduled mental health evaluation. Additionally, at the time of the termination hearing Jalisa was still at a supervised visitation level, 2 hours twice each week.

From June to November 2020, Jalisa's visits were out in the community or at the visitation provider's facility. The visitation worker stated that when visits were out in the community, Jalisa struggled with the children "because they [were] going every which way." In September, Jalisa told Lee that she got overwhelmed and was stressed at a visit, and that she was struggling to stay clean. Jalisa's probation was revoked on October 1 and she was sentenced to 90 days in jail, but was given credit for 46 days served; she was scheduled to report to jail on October 23. In November, visits occurred in Jalisa's new apartment. According to Berkebile, "there were some struggles" with visits in November. In November, Jalisa did request an increase in visitation, but DHHS wanted to see several weeks of consistent visits and progress before doing an increase. According to Berkebile, Jalisa's visits were better in December and into January 2021.

Another concern Lee had about Jalisa was her history of living with men who had lengthy criminal histories and/or been involved with drugs. At the time of the termination hearing Jalisa was once again living with Joshua, the man she had previously lived with at the time the current juvenile petition was filed in November 2018. Although Jalisa stated that Joshua had been sober since they got back together in August 2020, Lee was concerned because Joshua had "a long history of methamphetamines, and he's had his rights terminated on children, on his children."

In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Leyton C. & Landyn C., supra*. In terminating Jalisa's parental rights, the juvenile court stated:

> Recent events are encouraging for mother. She is on a healthy path for addressing her substance abuse problems. However, this comes after her children have been out of her home for 2 years. Jordan and Austin both are in therapy and have mental health needs requiring a stable and supportive environment. Their behaviors have been triggers for mother in the past. Recent improvements cannot be projected to establish Mother's ability to provide what her children need. It is not in the best interest of the juveniles to gamble on their future. . . . Many red flags exist in mother's current situation. Any additional efforts at reunification would be a lengthy process, which is not warranted any longer. The juveniles need permanency now.

We agree with the juvenile court's assessment.

The children have been in a kinship foster home since December 28, 2018. Two years later, Jalisa was still at a supervised level of visitation and had not completed court ordered requirements. Like the juvenile court, we acknowledge the recent progress Jalisa has made in addressing her substance abuse. This, along with her securement of employment and an apartment are commendable. Unfortunately, like the juvenile court, we also find that red flags exist in Jalisa's current situation and additional efforts at reunification would be a long process on top of the lengthy period of time already provided. Lee's testimony explained the different levels of visitation a parent can have. She stated that after supervised visits, "we go to drop-ins [sic] visits, and then if things are going well in drop-in visits . . . we go to unsupervised [visits]," and then after

unsupervised visits, "we start working on . . . overnights." At the termination hearing, Jalisa testified that she should currently be having at least 10 hours of visitation each week; presumably this means Jalisa herself was only comfortable with having continued supervised visitation, but with total hours increased from 4 to at least 10 hours per week. Jalisa's own estimation of her limits with supervised visitation underscores that reunification would still be a very lengthy process.

These children deserve permanency. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness as to Jalisa. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Jalisa's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Jalisa's parental rights to Jordan, Austin, and Bailey.

AFFIRMED.