IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ZOEY W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ZOEY W., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CASEY W., APPELLANT.

Filed October 31, 2023.    No. A-23-158.

Appeal from the County Court for Otoe County: DAVID J. PARTSCH, Judge. Reversed and remanded for further proceedings.

Megan R. Kielty and Timothy S. Noerrlinger, of Naylor & Rappl Law Office, for appellant.

Seth W. Hawkins, Deputy Otoe County Attorney, for appellee.

Diane L. Merwin, of Fankhauser, Nelsen, Werts, Ziskey & Merwin, P.C., L.L.O., guardian ad litem.

BISHOP, ARTERBURN, and WELCH, Judges.

BISHOP, Judge.

INTRODUCTION

Casey W. appeals from the decision of the county court for Otoe County, sitting as a juvenile court, terminating his parental rights to his daughter, Zoey W. We reverse and remand for further proceedings.

- 1 -

## BACKGROUND

### PROCEDURAL BACKGROUND

Casey is the biological father of Zoey, born in 2019. Kristin H. is Zoey's mother. Kristin's parental rights to Zoey were terminated during these same juvenile proceedings. However, because Kristin is not part of this appeal, she will only be discussed as necessary.

On October 25, 2020, Zoey was abandoned at a hospital in Nebraska City, Nebraska, and hospital staff contacted law enforcement. The next day, the State filed a petition alleging that Zoey was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). At the time of the filing, the names of Zoey's parents were unknown. The State also filed a motion for the emergency temporary custody of Zoey, asking that she be placed in the temporary custody of the Nebraska Department of Health and Human Services (DHHS). The juvenile court entered the custody order that same day and Zoey has remained in foster care ever since.

On November 4, 2020, the State filed an amended petition naming Casey as Zoey's father. The State alleged that Zoey was a child within the meaning of § 43-247(3)(a) because: Casey failed or refused to provide safe or suitable housing or proper shelter and care for her; Casey failed or refused to provide sufficient food and basic necessities for her; Casey failed or refused to provide proper care and supervision for her; and due to the foregoing, she was at risk for harm.

At a hearing on March 4, 2021, upon discussion of the amended petition, the State agreed that service had not been perfected on Casey. The matter proceeded with Kristin's entry of a plea as to the allegations against her. Pursuant to a journal entry entered on March 5, Zoey was adjudicated to be within the meaning of § 43-247(3)(a) based on Kristin's admissions to allegations against her. Pursuant to that same journal entry, Kristin's husband and Casey were ordered to undergo paternity testing. Casey appeared at a subsequent hearing on April 8, and genetic testing was once again ordered. Casey was ultimately determined to be Zoey's biological father.

On August 19, 2021, Zoey was adjudicated to be within the meaning of § 43-247(3)(a) based on Casey's admissions to the allegations in the amended petition set forth above.

Following a disposition hearing on October 21, 2021, the juvenile court ordered Casey to complete a domestic violence program, complete an initial diagnostic interview and follow recommendations, abstain from alcohol and controlled substances and submit to random testing, maintain a suitable residence and gainful employment, and maintain reasonable contact with his case manager and case providers. Following a review hearing on January 20, 2022, Casey was also ordered to complete a substance abuse evaluation. Following a review and permanency hearing on February 17, the court ordered that a bonding assessment between Casey and Zoey be completed.

On February 22, 2022, the State filed a motion to terminate Casey's parental rights to Zoey pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Casey had substantially and continuously or repeatedly neglected and refused to give the child, or a sibling of the child, necessary parental care and protection; reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); Zoey had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Casey's parental rights was in the child's best interests.

On April 27, 2022, Zoey's guardian ad litem (GAL) filed a "Motion to Determine Visitation Schedule," asking the juvenile court to make a specific determination on visitation

progression and direct DHHS to not increase visits to include overnights pending determination by the court. The GAL alleged that the parties attended a facilitated mediation wherein they agreed that if reunification continued to be pursued, then a specific progression plan would be in place that increased visits over a set number of weeks. The mediated plan set forth seven phases that each lasted 4 weeks in duration. However, DHHS notified the parties that it intended to progress visitations at a rate that was half the length of time for each phase. The first phase of the visitation plan called for visitations to be monitored every Saturday and Sunday, and every other Monday, from 7 a.m. to 6 p.m., and was the first time visits occurred in Casey's home. Because a motion to terminate Casey's parental rights was on file, the GAL did not believe that it was in Zoey's best interests to forego the mediated plan. In its order entered on May 31, the court sustained the GAL's motion and ordered, "Visitations for father and the minor child shall continue on the Phase 1 schedule of the mediated plan," and "Father's visitations shall continue to be monitored every Saturday, Sunday, and every other Monday from 7am [to] 6pm unless otherwise ordered by the Court."

TERMINATION HEARING

The parental rights termination hearing was held on August 5, 8, and 11, 2022. The State called several witnesses to testify, and numerous exhibits were received into evidence. Casey testified in his own behalf and called witnesses to testify on his behalf.

Casey testified that he and Kristin separated "a month" prior to Zoey's birth in 2019. After Zoey was born, Casey went to visit her in the hospital in Hastings, Nebraska, and learned that both she and Kristin had tested positive for methamphetamines. DHHS got involved, but ultimately Zoey, along with Casey's and Kristin's older child, was allowed to live with Casey, who moved to Wichita, Kansas; the case was transferred to the Kansas DHHS. Casey set up medical care for Zoey in Kansas and at her first appointment he learned that Zoey had jaundice, was lactose intolerant, and had low iron requiring a special formula. Kristin subsequently moved to Kansas with the intention of going to rehab. However, she never ended up going to rehab and Casey never told the Kansas DHHS that she was staying with him off and on. On cross-examination Casey said that Kristin did not move in with him until after the Kansas DHHS case was closed.

Casey testified that in April 2020, he and Kristin had a verbal altercation and she told him that she was taking the children and going to live with her husband (she was married to another man). Casey said he told Kristin that she could not do that because he had "parental powers" and then things got physical. He said, "So after I was stabbed with a pair of scissors eight times, I picked her up by her neck and I threw her down the hallway." The children, including an older child of Kristin's, were home at the time. Casey said he left because he "wasn't particularly fond of dealing with that kind of drama." When he returned, he was arrested for violating a protection order that Kristin had previously filed. According to Casey, the protection order was issued after Kristin filed for it, but they were still waiting for their court date. Casey said he was initially charged with aggravated battery, choking in a rude manner, which was a felony. He was in jail in Kansas from April to December 2020, when he got out on pretrial release. Casey subsequently pled to three misdemeanor counts and was placed on two years of probation in August 2021.

Kristin testified that she observed Casey using marijuana when Zoey and their older child were present. Kristin described her relationship with Casey as "very unhealthy," "very abusive,"

"[i]t was very controlling, emotionally damaging." Kristin confirmed that the children witnessed Casey's emotional and physical abuse of her. Casey assaulted her numerous times and "choked" her. The police were called during one incident and Casey was arrested; multiple children, including Zoey, were in the home at the time. After Casey was arrested in April 2020, Zoey was in Kristin's care until Kristin left her at the hospital in October 2020. Before Zoey was born, Kristin spoke to one of Casey's former girlfriends who said that Casey was abusive and controlling with her too. Kristin did not believe that Casey was a suitable person to take care of Zoey.

Officer George Horner, with the Nebraska City Police Department, testified that on October 25, 2020, he was called to the hospital in reference to a baby that had been left there that day. Upon arrival, Officer Horner spoke with the receptionist who explained that a woman dropped the baby off "at pretty much the front entrance area of the hospital," walked away, and did not return. The receptionist told the officer that she subsequently received a phone call from a woman explaining that the woman had ended up with the child and left the child at the hospital in hopes of a better future. A note expressing the same was left with the child as well, and it also stated what the person thought was the child's name, or at least part of the name. Officer Horner called the DHHS hotline to report what had happened, a DHHS worker arrived, and the child was placed into DHHS custody. By early November, law enforcement was able to determine that the child's name was Zoey, and that Casey and Kristin were her parents. It was also determined that it was Kristin who had dropped Zoey off at the hospital.

Derek Haynes, a child and family services specialist, testified that he received this case from the initial assessment worker on November 12, 2020. According to Haynes, the initial assessment worker was able to contact Casey on November 5. Casey was in jail in Kansas at the time, but the initial assessment worker spoke with him about Zoey's case and made him aware that Zoey was in DHHS custody. Sometime after Haynes was assigned to the case, he tried to contact Casey at the jail, but learned that Casey had been released in early December. Haynes had no other contact information for Casey, so he then made multiple phone calls to Kristin, a couple different police stations in the Kansas area, and attorneys who had worked with Casey in the past, but he was not successful in obtaining contact information for Casey.

Haynes eventually got an address and email address for Casey after Casey appeared at a court hearing on April 8, 2021. Haynes sent Casey an email and a letter shortly after the court hearing but did not get a response. Haynes received a phone call on May 25 from Casey's brother, who gave Casey's new phone number to Haynes. When Haynes called Casey that same day, Casey said he was living with a friend in Colorado and was not able to take placement of Zoey because he did not have a home of his own or a job. According to a court report and case plan received into evidence, Casey reached out to Haynes in mid-May and requested that visits start as soon as possible, but at a pre-trial hearing on May 27 it was determined it was necessary to hold off on visits until genetic testing results showed Casey as the biological father; visitation started on June 24.

Casey testified that while he was in jail, he received a call from DHHS informing him that Zoey had been placed in its custody. Casey said he provided the DHHS worker contact information for his brother and his friend. When Casey was put on pretrial release in December 2020, one of the stipulations was that he could not leave a particular county in Kansas and was not supposed to have contact with Kristin. Because he had nowhere to stay in Kansas, Casey ended up sleeping

under a bridge for a couple of months. Casey said he did not contact Nebraska DHHS after his pretrial release in Kansas because he did not remember which county Zoey had been placed with, and he did not have access to a cell phone or email to be able to contact anyone. Casey tried to borrow a phone from someone on the street, but "it was kind of hit or miss on even if I could get ahold of somebody." He tried to contact his public defender to get DHHS contact information. After his attorney was able to get in for a bond modification hearing, the judge allowed Casey to go to Colorado to stay with a friend or Nebraska to stay with his brother. Casey was not able to get ahold of his brother, so he went to Colorado in March or April 2021.

Casey testified that once he got to Colorado, it took him about 30 days to get a job and to be able to buy a phone, and that was when he contacted Haynes. Because Kristin was married to someone else when Zoey was born, DNA testing had to be done for Casey to have any rights to Zoey, including visitation. Casey said that it was not until after paternity was determined that a case plan was established for him to work towards reunification with Zoey. By late May or early June 2021 Casey had moved to Grand Island, Nebraska, and was living with his brother.

Haynes testified that after Casey moved to Grand Island in June 2021, contact was consistent and DHHS began developing a case plan for Casey so that he could work towards reunification. Casey began having supervised visits with Zoey. There were no issues during the visits, which occurred in the Lincoln, Nebraska area. Casey testified that he and Zoey would have breakfast at a restaurant, and then go to a church, the zoo, a park, or a play place. Zoey's foster father testified that there was a time when he told Casey that Zoey was lactose intolerant and was not tolerating sugary drinks, but Casey continued to give her sugary drinks. However, after Haynes told the foster father to get a letter from the pediatrician about not giving Zoey sugary drinks, which he did, Casey stopped giving Zoey sugary drinks. And a couple of times, Zoey came home sunburnt after a visit. Otherwise, Zoey's foster father had no concerns about Casey's visits.

A DHHS court report received into evidence shows that Casey's supervised visits started at 2 hours per visit, and then increased to 4½ hours per visit. According to Haynes, in September 2021, Casey's brother kicked him out of the home, and Casey began living in a hotel. Haynes stated that Casey was not able to have visits with Zoey at the hotel because "[i]t was an unsavory location," and was a place where there were drugs and criminal activity. Casey testified that because the hotel was "lower priced," it was "not in the best . . . condition," and "attract[ed] some rather unwanted individuals," but he continued to have his visits with Zoey out in the community. A DHHS court report received into evidence states that Casey had visits with Zoey two times each week beginning in October, and that the visits were 6 hours in length; visits were expected to increase to three times each week once Casey obtained a stable and approved residence. According to Haynes, Casey got his own apartment in Grand Island in February 2022. After that, Casey began having monitored visits with Zoey in his home from 7 a.m. to 5 or 6 p.m. on Saturdays and Sundays and every other Monday. Casey testified that Zoey calls him "'Daddy'" and "[s]he's attached at the hip," wanting him to go with her wherever she goes, and they cuddle and play together.

Exhibit 22 is a "Child Welfare Facilitation Summary" from a meeting that took place at "The Resolution Center" on February 15, 2022. According to the summary, Casey and his attorney, Zoey's maternal grandparents, the foster parents, Haynes, Zoey's GAL, and a facilitator from the Resolution Center participated in the meeting. Two plans were established, one for reunification and one for adoption. The reunification plan included a seven-phase transition plan (each 4 weeks

in duration) increasing Zoey's visits until "Zoey's transition to Casey's home is complete" in phase 7. Additionally, after phase 7 of the reunification plan, the foster parents would have visitation with Zoey three weekends per month from 6 p.m. Friday to 5 p.m. Sunday, and the foster parents would facilitate visitation between Zoey and her maternal grandparents one of those three weekends. Casey testified that his intention was for Zoey to maintain a relationship with her foster parents to smooth the transition for her and not just uproot her from her entire life. Under the adoption plan, if Casey's parental rights were terminated, the foster parents agreed to provide Casey supervised parenting time with Zoey every other weekend in a neutral setting until the foster parents felt comfortable lessening supervision and/or expanding parenting time with Casey. Zoey's foster father testified that if his family adopted Zoey, the plan was for Casey to continue to have contact with Zoey, as facilitated by the foster parents. Notably, at a permanency hearing and exceptions hearing held 2 days after the February 15 meeting, when the State indicated its intention to proceed with filing a motion to terminate Casey's parental rights, the juvenile court pointed out that it was "certainly unusual to have the county attorney and the Department in different places here, and it creates some complications as we move forward." The court added that DHHS, "who is normally the primary witnesses on any action to terminate parental rights" was opposed to filing a motion to terminate parental rights"; Haynes confirmed that was "[c]orrect." The court nevertheless found that because the child had been in "out-of-home care for a very long time," and the relationship between the child and her father had only developed "in recent months," that there were no exceptions, and the State could proceed with filing an action to terminate parental rights.

The foster father testified that they were in phase 1 of the transition. In phase 1, the foster parents met Casey at a truck stop in Syracuse, Nebraska, at 7 a.m. every Saturday, then Casey drove Zoey to Grand Island for his visit for the day, returning her to the foster parents at the truck stop in Syracuse at 6 p.m.; that was repeated every Sunday. Every other Monday, Casey picked Zoey up at her daycare in Nebraska City, transported her to Grand Island for his visit that day, and then met the foster parents at the truck stop in Syracuse in the evening. The foster father stated that Casey had missed six to eight visits, mostly due to transportation issues (either his vehicle was not working, or he did not get his gas voucher), but one missed visit was because Zoey was ill. Haynes testified that the drive from Grand Island to Syracuse is approximately 2 hours each way. DHHS provided Casey with transportation (if his vehicle was not working) or $100 in gas vouchers for each visit, but Casey told Haynes that was not enough for his vehicle. Casey testified that he traveled about 250 miles roundtrip from Grand Island to Syracuse for Zoey's visits, which was 500 miles per day since he picked her up in the morning and returned her in the evening. He received gas vouchers to help pay for gas, but the vouchers did not cover all of it because of the gas mileage on his truck, and some weeks he was making six roundtrips to Syracuse in a three-day period.

The foster father's concern regarding phase 1 visits was that he did not think Casey was getting enough sleep before transporting Zoey because of his work schedule. Haynes stated that Casey worked three jobs: full time construction, part-time cook at a restaurant, and as a bouncer at a nightclub. When asked if Casey's three jobs caused any problems with visitation with Zoey, Haynes responded, "There was concern with the hours he was working, not getting enough sleep to drive back and forth to pick Zoey up and drop her off." For instance, when Casey worked as a bouncer on Friday nights, he would get off work at 1 or 2 a.m. on Saturday, then drive from Grand

Island to Syracuse, and then sleep in his car until the foster parents dropped Zoey off at 7 a.m. Then Casey and Zoey drive back to Grand Island for their visit. After having Zoey all day, Casey would drive her back to Syracuse to meet her foster parents. He would then return to Grand Island to work his Saturday night shift, and then follow his same routine for Zoey's Sunday visit. Haynes stated that when he communicated the concern to Casey, Casey's response was that he was used to having very little sleep. When asked if it seemed that Casey was minimizing the potential risks for Zoey, Haynes replied, "Yes." Haynes stated that to better facilitate visits with Zoey, Casey agreed to stop working one of his part-time jobs. However, he had not done so at the time of the termination hearing.

Casey testified he currently worked full-time for a construction company (Monday through Friday from 6 a.m. to 4 p.m.) and his income from that job paid all his "primary bills." Additionally, he worked as a cook at a fast-food restaurant a "couple of nights" each week from 5:30 to 11 p.m., and he also worked at a nightclub on Friday and Saturday nights from 9:30 p.m. to 1:15 a.m. He also started doing some side work in construction. He was trying to get himself "relatively debt free" to get Zoey back.

Pursuant to Haynes' testimony, Casey's budget, exhibit 21, was based on his income from his main job, and it appeared that he should have been able to provide for himself and Zoey. Haynes stated that Casey has three children with his ex-wife in Arizona, but he does not have contact with or pay child support for those children. (Haynes acknowledged that there are no child support actions against Casey from another state that have been registered in Nebraska, and Haynes is not aware of any support order for Casey to pay child support for his other children in Arizona.) Casey and Kristen also have an older child in addition to Zoey. To Haynes' knowledge, Casey does not provide emotional, financial, or physical care for that older child. During her testimony, Kristin confirmed that there has never been a child support or custody order regarding their older child.

Casey testified that he prepared a budget that included income from all his jobs. In his budget he included anticipated expenses for Zoey's daycare and clothing. His monthly expenses were a little more than the income he made at his construction job. When asked how he planned on making up the difference if Zoey was returned to his care, Casey responded that he would continue to work at the fast-food restaurant and at the bar/nightclub the three weekends each month that Zoey was with her foster parents under the mediated agreement. If her foster parents could not take Zoey some weekend, Casey said his brother has agreed to watch Zoey. Casey also said that he could take a weekend off work if needed. Casey did not see an issue with working extra jobs when Zoey was not with him because it "provides a better standard of living" for them.

Haynes recalled trying to move forward with transitioning Zoey from phase 1 to phase 2 in April 2022, which was quicker than the parties had originally agreed to. At the time, Casey had a suitable residence, was compliant in meeting his DHHS case goals and completing services, and he was working with probation without issue. However, the GAL objected, and the juvenile court did not authorize the extended visitation. Eventually DHHS changed its position when it discovered Casey's criminal history in Arizona and Kansas. DHHS decided that slowing down the transition plan would be in Zoey's best interests because it appeared to DHHS that Casey may not have been forthcoming and may have been minimizing his history. Casey's criminal history caused concern about "safety and well-being of the child, first and foremost, and then whether the parent would be able to be present in the child's life, if [he] were to incur more charges."

According to Haynes, Casey was on probation from a domestic violence situation involving Kristin, and Zoey and her older sibling were present during that incident. Casey was scheduled to be released from probation in August 2023. A DHHS court report dated May 11, 2022, was received into evidence and states that DHHS received additional information, including Casey's criminal record from Arizona, which showed domestic violence dating back to 2014. (The criminal history from Arizona that was received into evidence shows that Casey had domestic violence and drug paraphernalia charges in 2014). According to Haynes, DHHS was concerned that Casey had been involved in domestic violence with multiple partners, and that children were present during more than one incident. DHHS was also concerned about the sustainability of any changes that Casey claimed to have made because, according to Haynes, Casey had not taken accountability for the domestic violence and instead gave excuses and blamed others. Haynes stated, "With the history that [Casey] has involving domestic violence and also the drug use, it's a concern that the changes we have seen throughout this case would be lasting and there would be concern that perhaps he would fall back into that habit."

Casey testified that although he was initially charged with aggravated battery, choking in a rude manner in Kansas (felony) following the incident with Kristin, he ultimately ended up taking a plea to three counts of misdemeanor domestic violence and was put on probation for 2 years, starting in August 2021. Casey completed a 36-week domestic violence class as part of his probation.

Casey also testified about two instances of domestic violence with his "ex" in Arizona in 2014. He said that he was the victim in one instance when "[m]y kid's mother stabbed me over 11 times with a pair of keys in the back"; she was arrested as a result. He said that during the other instance, "I had kicked in my front door to get the jersey that my dad had bought me before he had passed away" because "[m]y ex was on the other side of the door destroying all of my stuff"; he was arrested as a result. Casey said he was convicted of "Disorderly conduct/domestic violence" because he kicked the door in, and he was sentenced to 1 year of unsupervised probation and a fine.

Casey testified that he has not seen his children in Arizona since he left the state "about seven years ago," shortly after his twin boys were born. He left because he "wasn't really in a very good place." He was "smoking spice, which is a synthetic marijuana made with formaldehyde, and it's a very addictive drug and there was no chance in me getting clean around the people that lived there and the environment there." Casey moved to Nebraska to be near his brother. He said, "I took the opportunity to better myself initially because I wanted my boys to be able to come up and be with me." Later, "some stuff happened between [the boys'] mother and Kristin that their mother was, like, well, you're never going to see the boys again." Casey stated that there was never an order for child support or visitation for his children in Arizona. When asked why he had not tried to contact his children in Arizona, Casey said that initially he could not afford "to facilitate the transportation down to Arizona." But "[n]ow the reason that I haven't gone after it is because it would be emotionally traumatic to my children" because their mother moved on to another relationship with a man the children call "dad," and Casey did not think it would be good for the children's mental health for him to "just show up and be, like, oh, yeah, I'm your dad." Casey said his boys are 7 years old now and have always known another person to be their dad. Casey read online that "most children that are adopted or in a situation like that and they know about it stand

a 50 percent more chance of ultimately becoming addicted to drugs, suicide, things like that." Casey did not want to put his children into a situation where they could "potentially feel like [he] abandoned them."

Haynes testified that Casey was to find suitable housing and gainful employment, complete a parenting class, and complete a domestic violence class. He did all those things. Haynes stated that Casey was also supposed to complete an initial diagnostic interview and psychological evaluation. Casey testified that there was initially confusion with his family service worker about whether he needed a psychiatric evaluation or an initial diagnostic interview, which slowed things down because they were looking for a psychiatric evaluation. After it was determined he needed an initial diagnostic interview, one was scheduled. Haynes testified that Casey completed the initial diagnostic interview in March 2022. The record also indicates that Casey completed the psychological evaluation.

Casey said he completed his initial diagnostic interview and his evaluators were made aware of his probation for domestic violence. He said he was also honest about when he last used illicit substances. On cross-examination, Casey acknowledged that on his evaluation he said he smoked marijuana approximately 3 years ago, but he did not mention that he smoked "spice"; Casey said "ten years ago, spice wasn't even considered a drug[,] [i]t was considered a potpourri" and it was not until after he stopped smoking it "that it was even classified as a drug." He acknowledged that he was charged with possession of drug paraphernalia in Arizona in 2014; it was "a pipe that had THC and later the chemicals that were identified as spice."

Laura Kuszak testified that she had been Casey's probation officer since his case was transferred from Kansas in September 2021. She said Casey had been convicted on three counts of domestic battery, all misdemeanors, and sentenced to 2 years' probation. According to Kuszak, Casey's probation was set to end on August 16, 2023. He successfully completed the 36-week domestic violence intervention program, and he was going to take anger management as soon as a class was offered (there was a delay on anger management because Kuszak had to get clarification on whether it was a requirement; she received clarification within the last month). Casey also participated in random drug testing. He never missed a drug test or had any positive drug tests. Kuszak stated that Casey missed one appointment with her the previous month because he had forgotten, and that was the only sanction he had received while on probation (he was verbally reprimanded and counseled).

Angela Reimers, a child and family services permanency specialist, testified that she was assigned to this case in February 2022. She met with Casey face to face once per month, and she did a walkthrough of his apartment, noting no safety concerns. Reimers discussed the case plan with Casey and the progression of his case. Reimers also reached out to Haynes, the caseworker in Nebraska City, to see if there was anything that Casey needed to address; Haynes told Reimers there were not new concerns, but some of Casey's criminal history from when he lived out of state was concerning. Reimers observed one of Casey's visits with Zoey in August and said there were no concerns with his parenting.

Andrae Matthews is a supervisor at the company that provided family support for Casey. Matthews testified that family support for Casey was not ongoing at the time of the termination hearing because he had reached all the goals DHHS set for him. In mid-March 2022, the company started providing semi-supervised visitation services for Casey and Zoey, which were ongoing at

the time of the termination hearing. Matthews herself provided most of the visitation supervision and said Casey's interactions with Zoey were appropriate. Matthews said that no safety concerns were noted by Casey's other visitation worker whom Matthews supervises.

According to Haynes, when Zoey was dropped off at the hospital in October 2020, she was "underdeveloped" for her age. She was not talking or walking, was not up to date on her shots, had an iron deficiency, had protein calorie malnutrition, had a heart murmur, had a developmental delay, and had some optical issues. However, by the time of the termination hearing in August 2022, Zoey was in good health and just had her final surgery for her eye. She received Early Developmental Network services, including speech therapy and occupational therapy, and she had an Individual Education Plan because she was behind developmentally; she had shown improvement because of those services. Zoey's foster parents had been in communication with Casey about Zoey's medical appointments and school issues, but Haynes had no knowledge of Casey participating in the medical or educational appointments.

Zoey's foster father testified that Zoey had "at least a dozen" doctor appointments in the past year. Casey did not attend any of the medical appointments, but he was given updates afterwards. On two occasion when Zoey had to undergo anesthesia (once for an MRI, the second for surgery), Casey said he wanted to be there but could not get off from work; the foster father had informed Casey of the appointments 3 or 4 weeks ahead of time (the surgery time had changed, but not the day). As for educational meetings, Casey knew meetings were occurring, but he was not always informed about the meetings ahead of time. The foster father and Casey spoke "extensively" about Zoey's progress, but when asked if Casey ever expressed an interest in wanting to attend the meetings, the foster father said, "No."

Casey believed it was in Zoey's best interests to continue to have a relationship with him. He testified that "one of the main arguments we get into is who loves who more. She thinks she loves Dad more. Dad thinks he loves her more." Casey pointed out that Zoey sees him every weekend for large amounts of time and "it would be traumatic to her to have [him] removed from her life."

JUVENILE COURT'S DECISION

In an order entered on January 31, 2023, the juvenile court found that statutory grounds for terminating Casey's parental rights to Zoey existed pursuant to § 43-292(2), (6), and (7). The court also found that Casey was unfit, and that terminating his parental rights was in Zoey's best interests. The court terminated Casey's parental rights accordingly.

Casey appeals.

ASSIGNMENT OF ERROR

Casey assigns that the juvenile court erred in finding that termination of his parental rights was in Zoey's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate

court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Casey's parental rights to Zoey under § 43-292(2), (6), and (7). The juvenile court found that all three of those grounds existed by clear and convincing evidence. Casey does not dispute that § 43-292(7) was sufficiently proven, but for the sake of completeness, we briefly address it.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra.* Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra.* In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra.*

Zoey has been in an out-of-home placement since October 25, 2020, when her mother left her at a hospital. By the time the motion to terminate parental rights was filed on February 22, 2022, Zoey had been in an out-of-home placement for nearly 16 months. The 15-out-of-22 months' period was clearly satisfied.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Casey's parental rights to Zoey. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra.* We next consider whether termination is in the child's best interests.

### BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Zoey's mother abandoned her at the hospital in October 2020. At the time, Casey was in jail in Kansas. Although contacted by DHHS in November, Casey did not become involved in this case until he appeared at a hearing in April 2021. And it was not until paternity was established and he moved to Grand Island in June that he began having visits with Zoey. By all accounts, his visits with Zoey went well. Visitation reports described Casey as a "loving father," and said he was patient and never got frustrated with Zoey. Casey completed his court ordered requirements by getting a job and an apartment, submitting to random drug testing, and completing a domestic violence class, a parenting class, and an initial diagnostic interview. He did so well that by April 2022 DHHS wanted to transition Zoey to Casey's care more quickly than originally agreed to in a February meeting with all interested parties. However, the transition stalled after the GAL objected and the juvenile court ordered the visits to stay at phase 1. In its termination order, the juvenile court noted that visitations began as supervised and moved to monitored, but never moved to unmonitored or lasted overnight. However, that was due to the court's own ruling, despite DHHS wanting to proceed through the transition phases. As stated in Casey's brief, "It is patently unreasonable for a court to deny a parent the opportunity to progress through the phases of their reunification plan and then use the lack of progression as evidence of unfitness." Brief for appellant at 12.

Ultimately, DHHS ended up changing its position after considering Casey's criminal history. DHHS was concerned that Casey may not have been forthcoming and may have been minimizing his history. DHHS was also concerned about Zoey's safety and well-being and whether Casey would be able to parent if he incurred more criminal charges.

Regarding Casey's criminal history in Kansas which was related to an April 2020 incident with Kristin, Casey ultimately pled to three misdemeanor charges and was sentenced to probation. Casey's probation officer testified that Casey was doing what was asked of him (other than forgetting about one meeting for which he was verbally reprimanded) and he was set to complete probation in August 2023. As to his criminal history in Arizona, those incidents took place in 2014. Casey said he was convicted of "Disorderly conduct/domestic violence" because he kicked a door in, and he was sentenced to 1 year of unsupervised probation and a fine. Casey also testified that during his initial diagnostic interview his evaluators were made aware of his probation for domestic violence, and he said he was honest about when he last used illicit substances.

In its order terminating Casey's parental rights, the juvenile court stated, "Casey has completed a domestic violence course; nevertheless, at trial on this matter he deflected blame for his violent history by stating that his 'picker was broken' – testifying that he just couldn't pick good women." However, it was not Casey who testified to those statements. Rather, Zoey's foster father testified that after Casey ended a relationship during the pendency of this case, "'Casey would basically say, my picker is broken, when it comes to his love interests and he shouldn't be allowed to pick his own girlfriends.'" We fail to see how this comment made to the foster father deflected blame on a violent history.

Although there was concern about whether Casey had truly changed, particularly regarding his domestic violence issues, all concern was speculative. As stated in Casey's brief, "Even if it is true that at some unknown time in the past [Casey] was not taking full accountability for his past behavior, his testimony at trial clearly shows that he took the lessons learned through his domestic violence class to heart." Brief for appellant at 11. "If a parent's conduct prior to the filing of the

petition is sufficient evidence to support a termination of their parental rights, as the County Court posits, then there is little incentive to cooperate with the services provided through the juvenile court process." Brief for appellant at 11. Casey had complied with his court-ordered requirements.

Both the juvenile court in its termination order, and the GAL and the State on appeal, point to the fact that Casey works multiple jobs and their concern about his ability to safely transport Zoey on little sleep. Additionally, the GAL and the State are concerned about how much time Casey will have to parent Zoey if they are reunified, given that he works multiple jobs and has agreed to let the foster parents continue to have Zoey three weekends each month. However, Casey should not be punished for working hard to support Zoey and provide her with a better standard of living. Both Casey and the foster parents agreed that no matter what happened, reunification or adoption, the other party would still have a relationship with Zoey. And Casey testified that he would only work his extra jobs when Zoey was not with him.

At the time the termination hearing concluded, Zoey had been in an out-of-home placement for 21 months. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). But "in proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child." *In re Interest of Leyton C. & Landyn C.*, 307 Neb. at 543, 949 N.W.2d at 783-84. In this case, Casey substantially complied with his court ordered requirements and the recommendations made by DHHS, and he has a beneficial relationship with Zoey. Additionally, as noted previously in this opinion, at a permanency hearing and exceptions hearing held on February 17, 2022, DHHS supported increasing parenting time and opposed filing a motion to terminate Casey's parental rights. Although DHHS worker Haynes expressed some concerns about Casey at the termination hearing in August, he was never asked, nor did he testify, as to whether terminating Casey's parental rights was in Zoey's best interests.

In its order terminating Casey's parental rights, the juvenile court's finding of unfitness was focused on Casey's past conduct of domestic violence from 2014 and April 2020, all of which was prior to Zoey's abandonment at the hospital and subsequent out-of-home placement. However, "Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. This second hurdle is a high one for the State, since a parent's right to raise his or her children is constitutionally protected." *In re Interest of Mateo L. et al.*, 309 Neb. 565, 582, 961 N.W.2d 516, 528-29 (2021). On our de novo review, we find the State did not prove that Casey was unfit. Nor do we find that there is clear and convincing evidence that it is in Zoey's best interests to terminate Casey's parental rights.

Given the facts in this case, Casey should have been allowed to proceed with the transition plan and work towards reunification. If the transition went well and there were no further concerns about Casey, Zoey would have the chance to reunify with her father--this is the ultimate goal in juvenile cases whenever possible. However, if, as the transition progressed, there was cause for concern, then steps could have been taken to later terminate Casey's parental rights. Because we find that Casey should have been given more time to work towards reunification, we reverse the juvenile court's order terminating his parental rights to Zoey.

CONCLUSION

For the reasons stated above, we reverse the order of the juvenile court terminating Casey's parental rights to Zoey, and we remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.