IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ALIANNA M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ALIANNA M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ANGELA W., APPELLANT.

Filed March 11, 2025.    No. A-24-490.

Appeal from the County Court for Adams County: MICHAEL O. MEAD, Judge. Affirmed.

Shon T. Lieske, of Lieske, Lieske & Ensz, P.C., L.L.O., for appellant.

Cassie L. Baldwin, Deputy Adams County Attorney, for appellee.

RIEDMANN, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Angela W. appeals from the decision of the county court for Adams County, sitting as a juvenile court, terminating her parental rights to her daughter, Alianna M. We affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Angela is the mother of Alianna, born in 2018. Tyler M. is Alianna's father. Tyler's parental rights to Alianna were terminated during these same juvenile proceedings below. Because Tyler is not part of this appeal, he will only be discussed as necessary.

On April 6, 2022, the State filed a petition alleging that Alianna was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because of the following. On March 4,

Alianna was in a vehicle with a man (purportedly her grandmother's boyfriend) when a traffic stop of the vehicle was conducted; methamphetamine was located in the vehicle and the man was arrested. Attempts were made to contact Angela, but those attempts were unsuccessful. Tyler's whereabouts were unknown. There were concerns that Angela had not been providing proper care for Alianna for several months, that her residence was not safe, and that Angela was using controlled substances that would impair her ability to provide proper parental care. The State alleged that the actions and/or inactions of Angela resulted in the need for court intervention because Alianna was: without proper parental care by reason of the faults or habits of her parent, guardian or custodian; homeless or destitute, or without proper support through no fault of her parent, guardian, or custodian; and/or was in a situation dangerous to life or limb or injurious to her health or morals. The juvenile court entered an order on April 6 placing Alianna in the temporary custody of the Nebraska Department of Health and Human Services (DHHS). Alianna has remained in foster care ever since.

On April 14, 2022, the juvenile court ordered DHHS to arrange and pay for a co-occurring evaluation and directed Angela to cooperate with said evaluation. Visitation was to be at the discretion of DHHS.

On May 19, 2022, Alianna was adjudicated to be within the meaning of § 43-247(3)(a) based on Angela's "no contest plea to the no fault allegations of the petition only." (Emphasis omitted.) Angela subsequently filed a motion to withdraw her plea; the motion was overruled.

Following a disposition hearing on August 12, 2022, the juvenile court adopted the DHHS case plan and ordered all parties to comply with the terms of the plan, including any court ordered amendments. The DHHS case plan identified goals and strategies for Angela, as well as services. The first goal was for Angela to ensure that Alianna had all of her basic needs met. The identified strategies for that goal were for Angela to have a safe and clean living environment; financially support herself and Alianna through employment and/or community resources; ensure that Alianna's physical, educational, medical, and mental needs were met; and attend visits. The second goal was for Angela to ensure that she was living a healthy lifestyle for herself and Alianna. The identified strategies for that goal were for Angela to complete a co-occurring evaluation and follow the recommendations; sign a release of information so that DHHS could receive the results of that evaluation; and address her mental health and find healthy coping strategies to assist her with her daily stressors and anxiety. Services identified in the case plan were fully supervised visits, family support, family team meetings, monthly visits with DHHS, and a co-occurring evaluation. The court stated that the case plan was modified to have supervised visits, Angela was subject to "UA's," and she was to complete a psychological evaluation.

Following subsequent review hearings, the juvenile court continued to adopt DHHS' case plans and ordered all parties to comply with the terms of the plans. The foregoing goals and strategies set forth in DHHS' case plans remained the same throughout the pendency of the case. Angela was to follow the court's order for random UA's and complete a psychological evaluation and follow the recommendations. Identified services also remained the same, except that the co-occurring evaluation was subsequently replaced with a psychological evaluation. DHHS also added a safety goal wherein Angela was to seek counseling for her mental health and show she was not using illegal substances by drug testing, in order to keep Alianna safe physically and mentally.

On November 13, 2023, the State filed a "Supplemental Petition" to terminate Angela's parental rights to Alianna pursuant to Neb. Rev. Stat. § 43-292(6) and (7) (Reissue 2016). The State alleged that: reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the adjudication of the child under § 43-247(3)(a); the child had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Angela's parental rights was in the child's best interests.

TERMINATION HEARING

The parental rights termination hearing was held on April 15, 2024. The State called several witnesses to testify, and numerous exhibits were received into evidence. Angela did not testify, and she did not call witnesses to testify on her behalf.

Mikki Schoone was a child and family services specialist and initial assessment worker with DHHS. Schoone testified that she "received a priority-one intake" for Alianna on April 4, 2022, after "officers had pulled over her grandma's boyfriend in possession of methamphetamines, and Alianna was in the car, and they were unable to contact [Angela]." Schoone stated,

[The grandmother] was at the scene when I arrived. She was confused and unable to really follow a conversation. She was falling asleep during the time that we were having a conversation, so I didn't have a lot of information, but she did tell me that Alianna had been staying with her for a long time. She couldn't give me any specifics on the amount of time, but said that Angela had brought her over because her water was off in her home.

At the time, Schoon observed that Alianna's hair did not appear to be brushed, and she did not appear to be clean. Schoone "kept trying to call [Angela] and . . . tried to leave a message"; Schoone could not remember if she left a message or if she "just kept trying to call." Alianna was taken into protective custody.

Schoone said that when Angela called her later that day, she was

[e]rratic, screaming, yelling, telling me that I had kidnapped her daughter. She demanded that she come back. I told Angela that I had concerns with her home and would need to do a walk-through.

She was denying me access. So I just reiterated that I would need to walk through the home with law enforcement prior to being able to place her child because I needed to make sure that she was going to be safe when I placed her.

Schoone subsequently completed a walk-through of Angela's trailer home, but Angela "would stand in the doorway of each of the rooms so that we couldn't really enter the room and didn't let us into the back room, didn't let me look in the fridge, didn't turn on the water or flush the toilet," but Angela "finally at the end state[d] that the water was off." Schoone stated that a law enforcement officer spoke to Angela's landlord; the landlord reported that the water had been off since December 2021 and, at some point, the pipes froze and he had to remove the water main, but Angela had not yet purchased a new water main.

Schoone observed that Angela's home was "dirty," "there was some glass laying around in various places," and Alianna's room "had trash laying around" and "quite a bit of paint chips laying around." Additionally, "there was a rope tied from the back door onto the other door of the

back bedroom" and "Angela stated that that was to keep the back door shut, but she also wouldn't let us go into that back room." Schoone said the home "smelled like a skunk or possibly marijuana," but "Angela stated that she thought it was from vaping incense." Schoone was concerned that Angela was using substances and offered that Angela could go to the police department for a drug test, but Angela "got really upset at that point and . . . said it was her right not to."

Schoone determined that Alianna was unsafe in Angela's care because (1) Angela was unavailable when law enforcement called her, (2) Angela's home was not safe for Alianna to go to with no water, and with the trash, paint, and glass laying around, and (3) Angela was unable to meet Alianna's needs for supervision, food, and housing. Alianna was placed in a foster home. Schoone referred Angela for family support and supervised parenting time.

Glenda Mullen, a child and family services specialist with DHHS, was assigned to this case on April 20, 2022, and remained the ongoing caseworker at the time of the termination hearing.

After recounting the case plan goals and strategies adopted by the juvenile court, Mullen described Angela's overall progress as "[p]oor." Mullen attempted to meet with Angela monthly, but Angela refused to meet. Additionally, to Mullen's knowledge, Angela had not been employed during the pendency of this case. Although Angela reported being employed at two different businesses in the fall of 2023 and early 2024, Mullen was not able to confirm that Angela was actually employed at those businesses (a "CASA worker" spoke to a manager at one of the businesses, and the manager reported that Angela did not work there).

Mullen stated that family support had been offered throughout the pendency of this case, but Angela had not consistently participated in that service. Tami Gangwish, the chief executive officer of Futures Family Services, testified that 28 family support sessions were scheduled, but Angela did not show up or she asked to reschedule for 19 of them.

Gangwish also testified that Futures Family Services received a referral for drug testing. Angela did not consistently participate in drug testing; she refused testing and at times the company struggled with being able to contact and/or locate her. Between August 2022 and the end of 2023, Angela submitted to one test, but she did not provide enough of a sample to test. She then submitted to one test in January 2024, one test in March, and one in April; those three tests "were negative."

Mullen stated that in April 2022, Angela resided in a trailer park but was not able to have visits with Alianna there because at that time the home had safety issues. In August, Mullen did a walk-through of the home and determined that it was then safe enough for visits. There were times that Mullen did not know where Angela was residing. Mullen stated, "I showed up at Angela's house to try and visit with [her], and there was a notice of eviction on the front door"; Mullen did not recall the date that occurred." She said, "I tried to reach out to Angela. Angela has given me numerous addresses that were not actually addresses. She finally said that she lived at her mother's home." Angela was residing at her mother's home at the time of the termination hearing. Angela had not allowed Mullen to visit her at her mother's home.

In April 2022 there was a referral for 20 hours of supervised visitation, but Angela did not consistently participate; visitation hours were later reduced. Mullen stated that Angela missed appointments or showed up after the visitation provider had already returned Alianna to her foster home. After the original provider "turned back the referral" in June, Mullen found a new provider in July.

Gangwish testified that Futures Family Services received a referral on July 8, 2022, to provide supervised visitation. Between July 8 and October 4, 21 visits were scheduled; for 12 of those visits, Angela either did not attend, came late, or the visit had to be ended early due to issues. During visits, there were concerns regarding Angela speaking to staff "inappropriately," "raising her voice at staff," and "talking about the case or the police or [DHHS] in the presence of her daughter."

Mullen testified that supervised visitation ended on October 3, 2022, "[d]ue to Angela's erratic behavior." According to Mullen, on September 30, Angela had an "unapproved man in her home at the visitation. She became erratic. I was on the phone with [the visitation provider], so I could hear Angela yelling and screaming at the provider." Alianna was removed from the visit and Mullen decided to move visitation back to the provider's office instead of Angela's home. Then, at a visit on October 3, Angela was told she would have "to sit in the front" when "they went to go to get something for lunch," and Angela "got upset and started yelling and screaming, and the visit ended." After the visit on October 3, Alianna "vomited and defecated on herself" and Mullen "felt that the stress of the visits, until we could . . . get Alianna into therapy, was a bad idea." Mullen consulted with "the GAL, the CASA worker, and the . . . placement," and it was decided that Alianna needed therapy. Mullen stated that Alianna could not get into therapy until November 1. Mullen confirmed that DHHS never reinstated any kind of supervised visitation between Angela and Alianna; the last visit occurred on October 3, 2022.

Janice Sherman, a licensed independent mental health practitioner, was Alianna's therapist from November 2022 to August 2023. When Sherman started the intake process with Alianna in November 2022, DHHS had already suspended visits. After completing the intake process, Sherman recommended starting therapeutic visits; she did not recommend supervised visits at that time. When asked if she agreed with DHHS' position to suspend supervised visits, Sherman answered in the affirmative.

Sherman diagnosed Alianna with "other reactions to severe stress and upbringing away from parent." Sherman worked with Alianna to learn to identify and express emotion and to process trauma. The plan was to start family therapy at the end of November 2022, but that did not occur. Sherman explained that "[t]he first session was a telehealth appointment with just [Angela] prior to her coming in with Ali for therapy so we could talk about goals, treatment, and boundaries. The first appointment Angela did not show, rescheduled a few weeks later on telehealth, and she did show for that one." On December 13 they were supposed to start family therapy; Alianna was present, but Angela did not show up for the appointment. Sherman stated,

> When [Angela] did not show for that session, Ali was very, very sad. She was very withdrawn for the remainder of the session. She was quiet. She just kept rocking in her chair.
>
> A couple hours later I received multiple text messages from Angela and several phone calls. I was in another session, so I wasn't able to answer those immediately. And when I did get back with Angela, she was very upset, very demanding that we don't schedule 8:00 in the morning appointments.
>
> I explained to her that, you know, that was what I had available and what worked out best for Ali's school, so she didn't miss as much school.

She was very irrational. She was angry, just not able to have a conversation about rescheduling. And at that time is when I recommended a psychological evaluation and that she start . . . her own individual therapy before we continued with family therapy so she could get herself regulated.

Sherman stated that she received a copy of Angela's psychological evaluation on January 26, 2023, and it recommended ongoing participation in outpatient services. However, when asked if it was a psychological evaluation or an "IDI," Sherman responded that it was completed by a provisionally licensed practitioner, not a psychologist. According to Sherman, Angela was inconsistent with individual therapy and at some point, she changed therapists; "She did sign a release with those therapists so that I could have communication with them as well to see what her progress was." Sherman encouraged Angela to send Alianna letters. Angela sent Alianna one letter at the end of January that Sherman "process[ed] with Ali in therapy." Because of Angela's inconsistency with her own therapy, Sherman never recommended starting family therapeutic sessions. Sherman stopped seeing Alianna in August 2023 because she moved to a new foster placement an hour away from Sherman's office and it led to scheduling difficulties.

Sherman believed that it was in Alianna's best interests to achieve permanency. Sherman stated that "[c]hildren need safety, stability, [and] consistency to be able to grow and go through their developmental milestones," and "that state of limbo creates anxiety."

Jillyan Schmidt, a licensed independent mental health practitioner, was Alianna's therapist from September 2023 to January 2024. Schmidt diagnosed Alianna as having an "adjustment disorder with anxiety" and Alianna's treatment goal was to increase positive social interactions. Schmidt did not attempt to engage Angela in any sessions, but did speak with her on the phone "at least four times" because Angela wanted updates on Alianna's treatment.

Laurin Schleif, a "PLMHP," testified that she saw Angela for an intake in January 2023 and then they had one session afterwards. Schleif diagnosed Angela as having an adjustment disorder with anxiety and recommended outpatient counseling. But Schleif said her supervisor finalized the diagnosis after meeting with Angela in March; her supervisor changed Angela's diagnosis to "[o]ther specified mental disorder" and recommended that she complete a psychological evaluation before starting outpatient treatment. Schleif stated that Angela had two sessions scheduled after meeting with the supervisor in March, but Angela did not show up for the sessions.

Tiffany Minturn, a "LIMHP" and "LADC," completed an intake with Angela on August 10, 2023. Minturn diagnosed Angela as having an adjustment disorder with anxiety and depression, created a treatment plan for her, and recommended weekly sessions. However, Angela "was not seen again until December." Minturn discharged Angela in September for "no-showing," but her employer let Angela return, and Minturn met with her again in December. Between August 2023 and February 2024, Angela attended 7 sessions but had 15 "no-shows" and 1 cancellation. Minturn discharged Angela on March 14 because there was "over a 30-day gap of no[t] responding" since her last appointment on February 12; a discharge summary was completed on March 25.

Minturn stated that Angela "was very noncompliant with therapy," "[n]o progress was made," and "[t]he only . . . stability she had is that she moved back into her mother's house, per

her report." At the time of Angela's discharge, Minturn's recommendations were that Angela "attend weekly therapy to work on her treatment goals, to have stability," and "my goal for her, you know, when I was trying to work with her after she came back to therapy was to really be honest about the account of the removal of her daughter" because "[s]he could never be honest with me about that." Minturn also recommended that Angela obtain a psychological evaluation.

According to caseworker Mullen, Angela did not participate in a psychological evaluation; paperwork had to be completed before the provider could schedule an appointment, but the paperwork was not completed despite being sent to Angela "more than once."

Mullen opined that it was in Alianna's best interests to terminate Angela's parental rights "[d]ue to the lack of progress." Alianna remained in an out-of-home placement since her initial removal in April 2022.

## JUVENILE COURT'S DECISION

In orders filed on May 30 and 31, 2024, the juvenile court terminated Angela's parental rights to Alianna after finding that statutory grounds for termination existed pursuant to § 43-292(6) and (7), and that termination of parental rights was in Alianna's best interests.

Angela appeals.

## ASSIGNMENTS OF ERROR

Angela assigns, restated, that the juvenile court erred in (1) finding that statutory grounds exist to terminate her parental rights under § 43-292(6) and (7), and (2) finding that termination of her parental rights was in Alianna's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Angela's parental rights to Alianna under § 43-292(6) and (7). The juvenile court found that both of those grounds existed by clear and convincing evidence.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra.* Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L.*

*et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

Alianna was removed from Angela's care in April 2022 and remained in foster care thereafter. By the time the "[s]upplemental [p]etition" to terminate Angela's parental rights was filed on November 13, 2023, Alianna had been in an out-of-home placement for 19 months. The 15-out-of-22 months' period was clearly satisfied.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Angela's parental rights to Alianna. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*.

Furthermore, we note that because we do not consider whether termination of parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2024), which requires reasonable efforts to reunify families, is not applicable to the instant case. Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). See, also, *In re Interest of Mateo L. et al., supra* (reasonable efforts to reunify family required under juvenile code only when termination is sought under § 43-292(6)). We next consider whether termination is in Alianna's best interests.

BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Angela refused Mullen's attempts to meet monthly, did not consistently participate in family therapy, and only provided three sufficient samples for drug testing. Additionally, Angela did not complete a psychological evaluation and did not consistently attend individual therapy, both of which hindered her ability to resume visits with Alianna which were suspended in October 2022 due to Angela's behaviors.

Sherman believed that it was in Alianna's best interests to achieve permanency. And Mullen opined that it was in Alianna's best interests to terminate Angela's parental rights due to

Angela's lack of progress in this case. We agree. At the time the termination hearing concluded, Alianna had been in an out-of-home placement for 24 months. Alianna had not even had a visit with her mother in 18 months due to Angela's failure to complete a psychological evaluation and consistently participate in therapy. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Angela was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *id.* We further find that there is clear and convincing evidence that it is in Alianna's best interests to terminate Angela's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Angela's parental rights to Alianna.

AFFIRMED.